TEXTILE WORKERS PENSION FUND,
Plaintiff-Appellee,

v.

STANDARD DYE & FINISHING CO.,
INC., Rocco Barone, Bill Carafello,
Adolph Nazarro, Sr., Adolph Nazarro,
Jr., Joseph Nazarro, Dick Knight, David
Lavorgna and Morris Wax, Defendants,

Standard Dye & Finishing Co., Inc.,
Defendant-Appellant.

SIBLEY, LINDSAY & CURR CO., A DIVI-
SION OF ASSOCIATED DRY GOODS
CORP., Plaintiff-Appellee,

v.

BAKERY, CONFECTIONERY & TOBAC-
CO WORKERS INTERNATIONAL UN-
ION OF AMERICA, AFL–CIO

and

Bakery & Confectionery Union &
Industry International Pension
Fund, Defendants-Appellants.

Nos. 35, 70 and 428, Dockets 83–7004,
83–7328 and 83–7650.

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1983.

Decided Jan. 9, 1984.

Richard R. Bonamo, Woodbridge, N.J. (Frederick J. Dennehy, Wilentz, Goldman & Spitzer, P.A., Woodbridge, N.J., of counsel), for defendant-appellant Standard Dye.

Noel Arnold Levin, New York City (Ronald E. Richman, Morgan, Lewis & Bockius, New York City, of counsel), for plaintiff-appellee Textile Workers.

Kenneth F. Hickey, Washington, D.C. (Harry W. Burton, Stephen R. Lohman, Morgan, Lewis & Bockius, Washington, D.C., of counsel), for defendant-appellant Bakery & Confectionery Union & Industry International Pension Fund.

Henry Kaiser, Washington, D.C. (Julia Penny Clark, Jeffrey L. Gibbs, Bredhoff & Kaiser, Washington, D.C., submitted, of counsel), for defendant-appellant Bakery, Confectionery & Tobacco Workers International Union of America, AFL–CIO.

William L. Dorr, Rochester, N.Y. (Harris, Beach, Wilcox, Rubin & Levey, Rochester, N.Y., of counsel), for plaintiff-appellee Sibley, Lindsay & Curr Co., A Division of Associated Dry Goods, Corp.

Philip B. Kurland, Chicago, Ill. (John B. Coffey, III, Christopher G. Walsh, Jr., Rothschild, Barry & Myers, Chicago, Ill., Lester M. Bridgeman, Louis T. Urbanczyk, Washington, D.C.), for Arrow Transportation Co., Inc. and Republic Industries, Inc., amici curiae.

Baruch A. Fellner, Associate General Counsel, Washington, D.C. (Henry Rose, General Counsel, J. Stephen Caflisch, Special Counsel, Peter H. Gould, Terence G. Craig, David F. Power, Office of the General Counsel, Washington, D.C.), for Pension Benefit Guaranty Corp., amicus curiae.

Harris Weinstein, Washington, D.C. (Arvid E. Roach II, Covington & Burling, Washington, D.C.), for Transport Motor Express, Inc., E.W. Bohren Transport, Inc., and Essex Group, Inc., amici curiae.

Before CARDAMONE, PIERCE and PRATT, Circuit Judges.

CARDAMONE, Circuit Judge:

On these two appeals we are called upon to analyze the withdrawal liability provisions in the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA or Act), Pub.L. No. 96–364, 94 Stat. 1208 (codified in scattered sections of 29 U.S.C.). Although the two employers before us withdrew from the multiemployer plans, of which they had been members prior to the enactment of the MPPAA, the Act provides for withdrawal liability to be retroactively imposed. Thus, the common question in both appeals is whether the imposition of financial liability violates these employers' constitutional rights. This question has been the subject of extensive litigation, spawning scores of district court decisions and, as of this writing, dividing two of our sister circuits. *Compare Republic Indus. v. Teamsters Joint Council,* 718 F.2d 628 (4th Cir.1983) (Act upheld) *with Shelter Framing Corp. v. PBGC,* 705 F.2d 1502 (9th Cir.) (Act struck down), *cert. granted,* —— U.S. ——, 104 S.Ct. 271, 76 L.Ed.2d 253 (1983). We hold that the retroactive application of the MPPAA withdrawal provisions is constitutional in all respects.

Although this field of law has been plowed a number of times, we work it once again in the hope that our analysis, like Ariadne's slender filament of thread, will lead us surely through its labyrinths, making its complexities more easily understood. We turn first to the facts.

## I  Facts

### A—Standard

Standard Dye & Finishing Co., Inc. (Standard) was engaged for many years in the processing and distribution of dye and textiles. As an employer it contributed to a pension fund (Fund) on behalf of its employees beginning in 1961 when it signed a collective bargaining agreement with the Textile Union Workers of America (Union). The Fund is a self-insured multiemployer pension trust within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. (ERISA) as amended by the MPPAA, and is jointly administered by an equal number of employer and union trustees pursuant to 29 U.S.C. § 186(c)(5)(B)(1976).

In 1980 Standard decided to liquidate its business because it was unable to pass on increasing costs to its customers. It advised the Union of this decision in May 1980 and its board of directors and stockholders formally voted in favor of liquidation in June. The liquidation plan called for the sale of Standard's assets for $1 million. Standard was paid all but $256,500 of this sum from the sale proceeds and $522,611.62 was distributed to Standard's stockholders. All these events occurred before the enactment of MPPAA on September 26, 1980. After its enactment, Standard paid an additional liquidating dividend of $210,470.42 to its stockholders.

Employment of all production workers terminated June 20, 1980, save for a handful retained to perform tasks incident to closing down operations. The last of those employees were terminated on October 31, 1980. Standard continued to make pension fund contributions on behalf of this smaller group until their termination.

In March 1981 Standard notified the Fund that it planned to liquidate and distribute the balance of its remaining assets of approximately $267,000. In June the Fund calculated Standard's withdrawal liability to be $817,398, payable in 69 equal quarterly installments of $18,544 with a final payment of $12,053. Standard did not contest the actuary's calculation of the debt. When the Fund did not receive the first payment due in August, it advised the company that unless it received the initial installment by October 1981 it would exercise its right under MPPAA to accelerate the debt and declare the full amount of the liability due and payable. When Standard still failed to make the required payment, the Fund commenced this action in the United States District Court for the Southern District of New York against Standard and eight of its stockholders who received liquidating dividends. The defendants moved for summary judgment, contending that the retroactive application of the withdrawal liability provision of the MPPAA unconstitutionally violated their rights to due process. On October 21, 1982 Judge Sprizzo denied that motion and upheld the constitutionality of the statute, ruling that the retroactive provision constituted a "rational means to a legitimate end." Textile Workers Pension Fund v. Standard Dye & Finishing Co., 549 F.Supp. 404, 410 (S.D.N.Y.1982). Defendants filed a petition seeking permission to file an interlocutory appeal which the district court granted and we granted defendants leave to appeal under 28 U.S.C. § 1292(b).

### B—Sibley

Sibley, Lindsay & Curr Co. (Sibley), a division of the Associated Dry Goods Corporation, operates department stores in Rochester and elsewhere in the western part of New York State. For many years prior to 1980 Sibley operated a bakery at its Main Street store in Rochester. In 1955 the Bakery, Confectionery and Tobacco Workers International Union (Bakery Union) and various employers agreed to establish a pension fund. One year later Sibley negotiated and entered into a formal collective bargaining agreement with the Bakery Union, which

required it to make contributions to the pension fund.

The 1980 actuarial valuation report for the pension fund indicated that it was seriously overextended, listing assets of over $609 million and liabilities of over $1.4 billion resulting in an unfunded past service liability of $871 million. The total liability showed an increase of over $108 million from 1979.

On May 31, 1980 Sibley closed the bakery in its Main Street Rochester store and terminated the employment of 43 bakery workers. Earlier that month Sibley and the Bakery Union had executed an agreement with respect to the closing. Under its terms Sibley provided vacation and severance benefits to its terminated employees. The pension fund was not a party to the agreement, and the agreement did not purport to fix Sibley's withdrawal liability under ERISA.

In May 1981 the pension fund notified Sibley that its withdrawal liability amounted to $315,927 and Sibley began making monthly payments of $6,245 in July. The payments were made under protest to avoid the default provisions of the MPPAA. Sibley then filed this action in the United States District Court for the Western District of New York in June 1982 challenging the constitutionality of the retroactive imposition of withdrawal liability under the MPPAA. In August 1982, Judge Telesca denied the pension fund's and Union's motions to dismiss. Subsequently, Sibley's initial motion for a preliminary injunction and for a declaratory judgment was converted into a motion for summary judgment. On March 15, 1983 Judge Telesca granted Sibley's motion for summary judgment and ruled that the retroactive application of the MPPAA withdrawal liability provisions violated Sibley's right to due process of law. See Sibley, Lindsay & Curr Co. v. Bakery, Confectionary and Tobacco Workers Int'l Union, et al., 566 F.Supp. 32 (W.D.N.Y. 1983). From this judgment, the Union and pension fund appeal.

## II  Background and Legislative History

In order to understand the problem that Congress sought to remedy by imposing retroactive liability on employers withdrawing from multiemployer pension plans, it is necessary to review the reasons for the existence of these plans and the legislative history of the Act.

Multiemployer plans were originally developed in industries where job changes were frequent and there was little continuity in the employer-employee relationship. For example, in some industries employees are often hired for a specific project, and their employment terminates with the project's completion. In other industries conditions of fierce competition, frequent business failures or recurring layoffs prevent the establishment of a stable employer-employee relationship. In these kinds of industries workers cannot obtain meaningful pension rights from a single employer. Thus, collectively bargained for multi-employer pooled funds or plans came into being to provide pension protection for workers in highly volatile industries. See P. Berger and S. Hester, *Special Problems of Multiemployer Plans 1*, in *Pension and Profit Sharing Plans* (D. Rothman, ed. 1978).

Enacted in 1974, ERISA represented a comprehensive attempt by Congress to regulate the funding, management, operation, benefit provisions, and insurance of private employer pension plans. One of Congress' central purposes in enacting ERISA was to prevent the great personal tragedy suffered by employees whose vested pension benefits were lost when plans were terminated. *Nachman Corp. v. PBGC*, 446 U.S. 359, 374, 100 S.Ct. 1723, 1732, 64 L.Ed.2d 354 (1980). ERISA, therefore, set forth standards for pension plans regarding reporting and disclosure of information, participating and vesting rights, adequate funding, fiduciary responsibilities for trustees and enforcement procedures. In addition, ERISA created the Pension Benefit Guaranty Corporation (Guaranty Corporation) to provide insurance coverage for pension plan benefits in the event that a plan was terminated. In short, ERISA represented an attempt to protect and secure the pension rights and expectations of millions of em-

ployees and their dependents. *See* 29 U.S.C. § 1001 (1976).

Under ERISA, the Guaranty Corporation immediately insured the receipt of all "nonforfeitable benefits" that had been earned by employees in single employer plans. Multiemployer plan benefits were treated differently. They were not insured absolutely upon ERISA's enactment, but were guaranteed at the discretion of the Guaranty Corporation until January 1, 1978, when full guarantee was to become mandatory. *Id.* § 1381(c)(1). During the interim period, the Guaranty Corporation had discretion whether it would pay a terminating plan's participants the difference between the value of their guaranteed benefits and the value of the plan's assets on the date of termination. *Id.* § 1381(c)(2) (1974). If an employer wanted to withdraw it could do so without incurring liability, unless the plan terminated within five years of the employer's withdrawal without assets sufficient to provide employee benefits at the level guaranteed by the Guaranty Corporation. If a plan terminated, each employer who had contributed to the plan during the five year period preceding its termination incurred liability to the Guaranty Corporation for its proportionate share of the total expended, up to 30 percent of each employer's net worth. *Id.* §§ 1362, 1364.

As the January 1, 1978 date for mandatory guaranteed coverage drew closer, Congress became concerned about certain problems attendant to the changeover, particularly the potential costs of extending mandatory coverage to multiemployer plans. To have more time to consider the problem, it postponed the guarantee's effective date. *See* Pub.L. No. 95–214, 91 Stat. 1501 (1977). Pursuant to Pub.L. No. 95–214, the Guaranty Corporation prepared a comprehensive report analyzing the problems surrounding multiemployer pension plans. It noted that employer withdrawals posed a serious threat to the overall stability of such plans by burdening those employers that remained. As explained to the Ways and Means Committee:

A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

Pension Plan Termination Insurance Issues: Hearing Before the Subcommittee on Oversight of the Committee on Ways and Means House of Representatives, 95th Cong., 2d Sess. 22 (1978) (Termination Hearings).

After considering these recommendations, Congress introduced legislation in the Spring of 1979 which ultimately became the MPPAA. To provide additional time to consider this legislation, the effective date for mandatory multiemployer plan termination insurance was delayed. *See* Pub.L. No. 96–24, 93 Stat. 70 (1979) and Pub.L. No. 96–239, 94 Stat. 341 (1980). The question of employer withdrawals from multiemployer plans was continually cited as a major problem. In reporting favorably upon the bill, the House Education and Labor Committee addressed other problems as they affected financially troubled plans:

In the case of a financially troubled plan, termination liability creates an additional incentive for employers to withdraw early. In such a plan, contribution increases may be escalating so sharply that termination liability may prove cheaper than continuing the plan. The remaining employers have an incentive to terminate the plan. Where active employees determine that benefits may be provided for them at considerably less cost than current contributions and are satisfied that vested benefits for retirees and others are virtually 100 percent covered by the guarantees, there is an incen-

tive for the union to agree to terminate the plan. The result is to transfer the cost of providing benefits to the insurance system. The current termination insurance provisions of ERISA thus threaten the survival of multiemployer plans by exacerbating the problems of financially weak plans and encouraging employer withdrawals from and termination of plans in financial distress.

The problem is essentially one of maturing plans in declining industries and a law that has proven inadequate in some respects and disfunctional in others. The committee fears that absent the change made in H.R. 3904, termination of multiemployer plans will become an increasing economic reality in the next decade.

H.R.Rep. No. 869, 96th Cong., 2d Sess. 54–55, *reprinted in* 1980 U.S.Code Cong. & Ad. News 2918, 2922–23.

ERISA's withdrawal liability provisions thus created an incentive for an employer to withdraw from a financially troubled multiemployer plan. Since withdrawing employers incurred only a contingent liability, an employer could withdraw from a plan and gamble that the plan would survive for five more years. If it did, the employer would avoid withdrawal liability. Congress sought to eliminate this loophole by requiring a withdrawing employer to continue funding its proportionate share of the plan's unfunded benefit obligations in order to "relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." *Id.* at 67, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2935.

When the bill was first introduced on May 3, 1979 these rules providing for mandatory withdrawal liability were made effective as of February 27, 1979, the date on which the Guaranty Corporation had originally submitted its legislative proposals to Congress calling for these provisions. *Id.* at 100, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2968. Such retrospective effective date remained a part of the bill for

over a year until June 1980, when the Senate Finance Committee found it to be unnecessarily harsh and shortened the retrospective period by advancing the effective date from February 1979 to April 29, 1980. As Senator Matsunaga stated in the debate on the MPPAA:

The [retroactive] date was used to prevent any employer from withdrawing from a plan under the lenient rules in current law. To permit the withdrawal of these opportunistic employers without imposition of liability, would shift the entire burden on employers remaining as plan participants. The withdrawing employers whose workers had added to the plan's liability, would avoid their responsibility . . . .

*[T]hese employers would be able to walk away . . . and leave the other employers holding the bag . . . .* (emphasis added)

126 Cong.Rec. 20,234 (1980) (statement of Sen. Matsunaga). *See id.* at 20,177 (statement of Senator Javits).

On May 22, 1980, the House unanimously approved the Act. *Id.* at 12,233–34. Senate approval for its version followed on July 29, 1980 by a vote of 85–1, *id.* at 20,247. After differences between the two Houses were resolved in September 1980, President Carter signed the MPPAA into law on September 26, 1980.

### III *Due Process Analysis—Nachman Factors*

It is familiar law that legislative acts adjusting the burdens and benefits of economic life carry with them a presumption of constitutionality and that the person complaining of a due process violation must establish that the legislature has acted in an arbitrary and irrational manner. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15–16, 96 S.Ct. 2882, 2892–2893, 49 L.Ed.2d 752 (1976); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955). The same rule prevails even though the effect of the legislation is to impose a new duty or liability based upon past acts. Thus, in *Turner Elkhorn,* the Supreme Court upheld the constitutionality of a federal law imposing liability on coal

industry employers to compensate employees suffering from black lung disease despite the fact that they had terminated their employment *before* the act was passed. While the Supreme Court acknowledged that the justifications for prospective legislation may not suffice for retrospective legislation, it nevertheless rejected the employers' due process challenge, holding that the statute represented "a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor." 428 U.S. at 18, 96 S.Ct. at 2893.

In examining the constitutionality of the withdrawal liability provisions of the MPPAA, both of the courts below employed the analysis first set forth by the Seventh Circuit in *Nachman Corp. v. PBGC,* 592 F.2d 947, 960–63 (7th Cir.1979), *aff'd on other grounds,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). In *Nachman,* the Seventh Circuit upheld the employer liability provision of ERISA's single employer plan termination scheme against a due process challenge. After pointing out that rationality is determined by comparing the problem to the nature and scope of the burden imposed to remedy it, the court considered four separate factors. The *Nachman* court emphasized that these factors were only to be used to decide whether the legislation represented a rational means to a legitimate end, but were *not* to be used to express judicial approval or disapproval of the balance struck by Congress. *See* 592 F.2d at 960. The factors were: (1) the reliance interests of the parties affected; (2) whether the impairment of the private interest is effected in an area previously subjected to regulatory control; (3) the equities of imposing the legislative burdens; and (4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. *Id.*

After applying the *Nachman* factors the courts below reached opposite conclusions. The Fourth and the Ninth Circuits also applied the *Nachman* analysis with different results. Without deciding whether the traditional due process analysis or the *Nachman* approach should apply, we conclude that, in any event, the retrospective withdrawal liability provisions of the MPPAA are constitutional under the heightened *Nachman* four-factor test.

### First Factor

In reaching this conclusion, we believe that the reliance interest of the Fund's participants in the ultimate realization of their vested benefits outweighs the employers' interests in withdrawing from the Funds prior to the MPPAA's enactment date. The employers argue that they relied on the existing state of the law at the time of their withdrawal and were "entitled to expect that ERISA would not be amended retroactively." This contention is not persuasive. While the MPPAA had not been passed at the time both of these employers ceased operations, its existence—together with its retrospective withdrawal liability provision—was a matter of public knowledge. The bill, originally introduced in May 1979, contained the retrospective mandatory withdrawal liability rules and, throughout the period predating passage of the Act, the concept of mandatory withdrawal liability had been the subject of intense congressional scrutiny. Nevertheless, the provisions of the MPPAA were left retrospective because of Congress' concern that many opportunistic employers would be encouraged to take advantage of the inherent delays in the legislative process and withdraw from plans prior to the enactment date. *See* 126 Cong.Rec. 9,236 (1980) (remarks of Sen. Bentsen); *id.* at 20,177 (remarks of Sen. Javits).

By April 29, 1980, the final effective date of the legislation, the MPPAA was well along the road to enactment. Three congressional committees had already approved the bill with its original effective date of February 27, 1979. Such original date had remained a part of the bill until the Senate Finance Committee advanced the effective date to April 29, 1980. At the time Standard and Sibley withdrew from their plans there was strong evidence that the passage of the MPPAA was imminent and that the statute would be retrospective. Under

these circumstances the employers were on constructive notice of their potential liability under the new statute. *See Republic, supra,* 718 F.2d at 638–39; *Peick v. PBGC,* 539 F.Supp. 1025, 1053 (N.D.Ill.1982); 126 Cong.Rec. 20,234–36 (1980) (remarks of Sen. Matsunaga); *id.* at 20,177 (remarks of Sen. Javits). *But see Shelter Framing, supra,* 705 F.2d at 1511.

The Funds also assert an independent worker reliance interest. They claim that the employees bargained with their employers for pension contributions, and relied on them to continue making the agreed upon contributions to the plans so as not to prejudice employees' pension rights. In *Nachman,* the court found that the employees' reliance on receiving their vested benefits outweighed the employer's reliance on its ability to terminate its obligations without continuing liability. Concededly, *Nachman* involved a single employer plan, while the instant cases involve multiemployer plans where the participants do not have specific promises *from their own employers* to pay their pension benefits. It is nonetheless reasonable and fair to conclude that plan participants did expect their employers to continue making contributions necessary to support these expected benefits. The reason is plain. In negotiating collective bargaining agreements with the unions, both Standard and Sibley bargained for and received the services of their employees and, in return, agreed to contribute specified amounts into the pension funds on their employees' behalf. In agreeing to make these contributions, Standard and Sibley were, in effect, negotiating the issue of their employees' present wages at a level different than otherwise would obtain, absent the employer's promise to make pension contributions. The fact that the pension payments ultimately would come from the Funds rather than directly from the employers cannot alter the fact that the employers obtained their bargained for benefits in exchange for their promises to make payments to the plans.

In *Shelter Framing,* the Ninth Circuit concluded that the employees' reliance interest went more toward the solvency of the plan as a whole rather than toward a single employer and that such interest did not translate into a justified reliance interest in any single employer's withdrawal liability. We disagree with the Ninth Circuit's conclusion because, regardless of whether the employee looks to the solvency of the whole plan instead of only its own employer, there still is a justifiable worker reliance interest. As just noted, in the multiemployer context the promise to pay benefits runs not from an employer, but from the trust. To the extent that any single employer withdraws from a plan, that employer is not directly breaching a duty to pay benefits to its employees. Nonetheless, the withdrawal of an employer from a multiemployer plan has the effect of placing the burden on the remaining employers to fund the plan. With that increased burden, other employers might also be tempted to withdraw, further weakening the contribution base and, eventually, jeopardizing the solvency of the entire plan. *See* Termination Hearings, *supra.* Viewed in this light, the threat of any single employer's withdrawal directly affects an individual employee's interest in having a viable and solvent pension fund, even though the fund is a multiemployer fund.[1] In sum, we believe that the reliance interest of the employees was greater than the interest of the employers and therefore this first factor favors the retroactive application of the statute. *See Republic, supra,* 718 F.2d at 638; *Peick, supra,* 539 F.Supp. at 1052–53. *But see Shelter Framing, supra,* 705 F.2d at 1511–12.

### Second Factor

The second factor in *Nachman*—whether impairment of the private interest is effected in an area previously subjected to regu-

---

1. By Sibley's own account the Fund was seriously overextended, and it stated that it did not want to make further contributions to the Fund because of "a substantial likelihood that at the conclusion of this action [it would] be unable to recover the sums paid to the Fund due to the Fund's financial condition."

latory control—weighs heavily against the employers in this case. In *Nachman,* the court wrote that since plan terminations had previously been subject to federal regulation, an employer's expectation that it would not have to fund its plan's vested benefits could be given less weight by Congress. 592 F.2d at 962. In that case the presence of IRS regulations with respect to plan termination mitigated Nachman's claim of surprise when ERISA was enacted with termination liability provisions. *Id.* at 962 n. 33.

Just as the employer in *Nachman* was charged with constructive notice that its rights might some day be subject to congressional regulation, so too were Standard and Sibley. Notice was everywhere. At the time that these employers decided to close their operations, there had been decades of pre-MPPAA regulation of multiemployer plans under a variety of federal labor and tax laws. *See Peick, supra,* 539 F.Supp. at 1044. The enactment of ERISA in 1974 provided a comprehensive regulatory scheme mandating employer withdrawal liability in the single employer context. This, in itself, can be said to have "afforded clear warning that the federal government might one day act again and further buttress the legislative scheme it had created." *Peick, supra,* 539 F.Supp. at 1044–45 (footnote omitted). Standard and Sibley withdrew from their funds not only when pervasive regulation, including withdrawal liability under ERISA, existed in the pension field, but also when the advent of the MPPAA was imminent. Their withdrawal from plans—under fire as it were—makes their claim of reliance on the immutability of the law ring hollow. Because employers knew of a potential liability under ERISA for funding a share of vested employee benefits upon withdrawal, we do not share the view of the Ninth Circuit that the passage of the MPPAA—which fixed the already anticipated liability—effected a "drastic" change in the existing law. *See Shelter Framing, supra,* 705 F.2d at 1512.

### Third Factor

The third *Nachman* factor involves weighing the equities of imposing the burden of withdrawal liability on Standard and Sibley. The employers argue that it is arbitrary and inequitable to burden them with liability for contributions beyond those they had agreed to pay. Sibley additionally maintains that it is not to blame for the unfunded vested liabilities incurred by the Fund and that fault should properly be placed on the Fund's trustees. The Funds, on the other hand, assert that a balancing of the same equities justifies the imposition of withdrawal liability on the employers rather than increasing the obligations of the remaining employers or jeopardizing the participants' vested pension benefits. In *Nachman,* the court found it reasonable for Congress to conclude that an employer, which had received its bargained for benefits, should bear the costs of a plan termination, rather than employees with vested benefit rights. 592 F.2d at 962. Adopting the view of *Turner Elkhorn, supra,* the *Nachman* court found the liability to be an actual, measurable cost of an employer's business. *Id. See Turner Elkhorn, supra,* 428 U.S. at 19, 96 S.Ct. at 2894.

When Congress was considering the MPPAA, it had to decide whether the withdrawing employer, remaining employers, or employee participants should bear the burden of any shortfalls in multiemployer plans. One of the flaws Congress had perceived in ERISA was its potential for encouraging early withdrawals. It was precisely this built-in weakness that Congress sought to remedy by making the Act retrospective. Certainly, it was not unreasonable for Congress to require the withdrawing employers to bear their burden of funding, rather than to leave the remaining employers "holding the bag." *See* 126 Cong.Rec. 20,234 (1980) (remarks of Sen. Matsunaga).

The employers' argument that the trustees should bear the burden for the underfunding is without merit. Although the trustees owe a fiduciary duty to the participant beneficiaries of the trusts, this obligation does not prevent them from also considering the impact of their actions on em-

ployers. 29 U.S.C. § 186(c)(5)(B). Inasmuch as the employers select half of the trustees, some consideration by the trustees of the employers' interests was likely. *See Peick, supra,* 539 F.Supp. at 1047–48.

From an examination of the Act itself, Congress plainly did not place the entire burden of underfunding on the withdrawing employers. Instead, the withdrawal liability feature was merely one part of a comprehensive revision of the law governing multiemployer plans. Under its compass, for example, Congress required employers to make higher minimum contributions than under ERISA, 29 U.S.C. § 1423 (Supp. V 1981); the Guaranty Corporation's insurance premiums were increased, *id.* § 1306; funds were made available to supplement plan assets so that insolvent plans could continue to operate with reduced benefit payments and without requiring prohibitively high employer contributions, *id.* § 1431; participants' benefits were made subject to limited reductions in financially troubled plans, *id.* § 1426, and the Guaranty Corporation's guarantee was reduced, *id.* § 1322a. *See Peick, supra,* 539 F.Supp. at 1051–52. One can hardly conclude that Congress acted arbitrarily in balancing the equities among the various parties involved in multiemployer plans. On balance, the equities weigh in favor of the employees, and thus, this factor also supports the retroactive application of the Act. *See Republic, supra,* 718 F.2d at 638–39.

### Fourth Factor

The final factor considered in *Nachman* was whether the statute included provisions to limit and moderate the impact of the burdens imposed. *See* 592 F.2d at 962–63. The employers maintain that the MPPAA lacks any moderating features similar to those in the single employer plan before the court in *Nachman* and conclude that this factor weighs against the retroactive application of the statute. The Funds assert that the Act contains numerous provisions designed to moderate the effect of the employer withdrawal liability provision. We agree with the latter contention.

We share the view of the *Republic* and *Peick* courts that Congress included a number of features designed to limit the impact and application of withdrawal liability. These provisions included limitations on what *conduct* of an employer constitutes a complete or partial withdrawal. *See, e.g.,* 29 U.S.C. § 1384 (Supp. V 1981) (a cessation of covered operations as a result of a sale of an employer's assets will not, if certain conditions are met, result in a withdrawal); *id.* § 1398(1) (a withdrawal need not occur solely because of a change in corporate structure); *id.* § 1398(2) (withdrawal does not occur solely because of a suspension of contributions during a labor dispute). Congress also put certain limitations on the *amount* of an employer's liability where a withdrawal occurs. *See, e.g., id.* § 1389 (*de minimis* rule eliminating all withdrawal liability on assessments under $50,000); *id.* § 1405 (reducing liability upon the sale of assets); *id.* § 1399(c)(1)(B) (limiting an employer's liability "to the first 20 annual payments" in the event that more than twenty years are needed to amortize withdrawal assessment). Finally, Congress provided for *reductions* in the amount of employer's withdrawal liability based upon the occurrence of events subsequent to the withdrawal. *See, e.g., id.* § 1387 (liability may abate if employer resumes covered operations after a complete withdrawal); *id.* § 1388 (liability may abate if employer increases its contribution base units after a partial withdrawal); *id.* § 1384 (eliminating imposition of withdrawal liability where employer sells assets to an unrelated party, and that party continues to contribute at substantially the same level as the withdrawing employer). These provisions governing the kind of conduct, limitation on amount, and reductions based on subsequent events highlight the far-ranging efforts made by Congress to ameliorate the imposition of employer withdrawal liability. Accordingly, as in the analysis of the first three factors, the fourth *Nachman* factor must be viewed as supporting the retroactive application of this legislation.

Upon a consideration of all the *Nachman* factors, we conclude that the MPPAA pro-

visions challenged here represent a rational means to a legitimate end and that the retroactive application of the withdrawal liability provisions does not violate the due process rights of either Standard or Sibley.

### IV—*Sibley's Other Constitutional Challenges*

#### A. Denial of the Due Process Rights to a Pre-Payment Hearing

■ Sibley has raised a number of other constitutional challenges to the MPPAA. It maintains that the Act impermissibly fails to provide it with a meaningful hearing prior to payment of its withdrawal liability. The fundamental requirement of due process, of course, is the opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Unlike some legal rules, due process is not a technical concept with a "fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citing *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In *Mathews*, the Supreme Court held that a hearing was not required prior to the termination of Social Security disability benefits. In considering when a hearing was necessary, it focused on three factors: the private interest affected; the risk of an erroneous deprivation of such interest through the procedures used; and the public interest, including the functions and fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *See* 424 U.S. at 335, 96 S.Ct. at 903.

■ Applying that analysis, the only private interest affected here is the employer's bank account. Since the statute requires an employer to make payments to the fund for its withdrawal liability, the MPPAA deprives it of the use of the funds paid. 29 U.S.C. § 1399(c) (Supp. V 1981). Nonetheless, such deprivation may be only temporary for if it is later found that an employer did not owe the amount determined, or that it owed a lesser amount, the employer is entitled to a refund or an adjustment in the amount of its liability. *Id.* §§ 1103(c)(4), 1401(d). Again, while a full hearing prior to payment of withdrawal liability might reduce the possibility of an erroneous assessment, under the statute an employer is already permitted to furnish the plan with further information or point out inaccuracies in the Fund's determination of liability. *Id.* § 1399(b)(2). In such case, the Fund is required to undertake a "reasonable review" of such information, *id.* § 1399(b)(2)(B), and must notify the employer of its decision, the grounds for its decision, and the reason for any modification in the employer's withdrawal liability, *id.* These statutory provisions afford the Fund and the employer an opportunity to iron out their differences, possibly eliminating an erroneous deprivation of an employer's property. Upon a consideration of the public interests here involved, *see* fourth factor, *supra*, we have concluded that the legislative scheme employed by Congress for the collection of employer withdrawal liability was rational and did not violate Sibley's right to due process of law. *Mathews v. Eldridge, supra*, 424 U.S. at 349, 96 S.Ct. at 909. *See Republic, supra*, 718 F.2d at 640–42. The additional analysis on the claimed denial of a pre-payment hearing reinforces our earlier conclusion.

#### B. Denial of Access to the Courts and Trial by Jury

Sibley has also challenged the compulsory arbitration procedure of the MPPAA, maintaining that it violates Sibley's right of access to the courts and trial by jury. Specifically, Sibley attacks the rationality of having the trustees make the initial determination of withdrawal liability. Sibley challenges the presumption of correctness attaching to the Fund's determination, labeling the presumption as "arbitrary and irrational." Finally, Sibley argues that the withdrawal liability scheme of the MPPAA

purports to create legal rights of a type normally enforced in an action for damages and concludes that it should be afforded a jury trial. We have considered these claims and find them all to be without merit.

■ We begin by rejecting Sibley's contention that the trustees are inherently biased. *Ward v. Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), which it cites as support is distinguishable. In *Ward,* the Supreme Court held that a party was denied a fair trial when compelled to be tried before a mayor, responsible for village finances and whose court provided a substantial portion of the village funds. The Supreme Court found the local court biased in the course of performing its judicial function. Unlike that situation, the trustees here are required by law to serve the fund impartially, i.e. without regard to whether they were appointed by labor or by management, and to compute the employer's withdrawal according to certain detailed and explicit statutory guides. *See* 29 U.S.C. § 1391 (Supp. V 1981). Under these circumstances, we perceive no unfairness in Congress' decision to place the initial determination of withdrawal liability on the trustees and to provide that the Fund's determination is presumptively correct. *See Republic, supra,* 718 F.2d at 640–41. Further, since section 1401(b)(2) provides that either party may come to the district court to enforce, vacate or modify an arbitrator's award, Sibley is not denied meaningful access to the courts. *See Republic, supra,* 718 F.2d at 641–42.

■ Finally, we do not believe that the Act unconstitutionally deprives Sibley of a jury trial. It is well established that the Seventh Amendment applies only to "suits at common law." When Congress creates a new cause of action and remedies unknown to the common law, it may vest factfinding in a tribunal other than a jury, free from the strictures of the Seventh Amendment. *See Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 458–61, 97 S.Ct. 1261, 1270–72, 51 L.Ed.2d 464 (1977); *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 48–49, 57 S.Ct. 615,

629–630, 81 L.Ed. 893 (1937). Sibley's reliance on *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) for support misses the mark. In *Curtis* the Supreme Court held the Seventh Amendment applicable to private damage suits in federal courts brought under the housing discrimination provisions of the Civil Rights Act of 1968. There, Congress had simply provided for the enforcement of statutory rights in an ordinary civil action in the district courts, and the Supreme Court found no functional justification for denying the right to trial by jury for actions that involved rights and remedies typically enforced in an action at law. *See* 415 U.S. at 195, 94 S.Ct. at 1008. In contrast, under the MPPAA, Congress set up a detailed procedure involving the use of a specialized tribunal in which facts are not found by a jury. There is no constitutional infirmity in this legislative decision. *See Republic, supra,* 718 F.2d at 642.

### C. Vagueness

Sibley next maintains that the statute is unconstitutionally vague. This challenge centers around the statutory method for calculating the amount of withdrawal liability. Sibley maintains that the language in 29 U.S.C. § 1393 providing for the use of "reasonable" actuarial assumptions and methods, and for allowing the use of actuarial estimates defies fair and consistent application, and that it is therefore unconstitutionally vague.

■ Challenges to federal statutes on the ground of vagueness rest on the principle that a person should be free to plan his or her behavior based upon laws which are clear enough to afford one a reasonable opportunity to know what is permitted and what is proscribed. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The degree of vagueness tolerated under the constitution varies, in part, according to the nature of the enactment. Statutes governing economic regulation are subject to a less stringent vagueness test than those governing constitutionally protected rights. *Village*

of *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193–94, 71 L.Ed.2d 362 (1982). The only challenges here are to those provisions used to calculate the amount of withdrawal liability.

■ In reviewing vagueness challenges, courts have consistently upheld the use of phrases which on their face are not particularly descriptive. *See, e.g., United States v. National Dairy Prods. Corp.,* 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) ("unreasonably low prices"); *Boyce Motor Lines v. United States,* 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367 (1952) ("so far as practicable, and, where feasible"); *Old Dearborn Distrib. Co. v. Seagram Distillers Corp.,* 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109 (1936) ("fair and open competition"); *Sproles v. Binford,* 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167 (1932) ("shortest practicable route"); *diLeo v. Greenfield,* 541 F.2d 949 (2d Cir.1976) ("other due and sufficient cause"); *Brennan v. Occupational Safety & Health Review Comm'n.,* 505 F.2d 869 (10th Cir.1974) ("near proximity"). Other courts that have already considered similar vagueness challenges to the MPPAA have uniformly rejected them. *See, e.g., Republic, supra,* 718 F.2d at 643; *Shelter Framing Corp. v. Carpenters Pension Trust,* 543 F.Supp. 1234, 1241 (C.D.Calif.1982), *rev'd on other grounds,* 705 F.2d 1502 (9th Cir.1983); *Peick, supra,* 539 F.Supp. at 1059–61. We agree with the Fourth Circuit—where the employer raised similar challenges to the statute—that the phraseology employed is not so lacking in meaning as to be invalid. *See Republic, supra,* 718 F.2d at 643. Sibley's other vagueness claims are totally without merit and do not warrant discussion. In sum, the challenged provisions are not unconstitutionally vague.

### D. *Denial of Equal Protection*

Sibley next asserts that the MPPAA is violative of Equal Protection by discriminating against it and other employers who were already contributing to multiemployer plans at the time of the MPPAA's enactment. Sibley maintains there is no rational basis for treating it differently from employers joining multiemployer plans after the date of enactment. Specifically, Sibley points to the "free look" provision under which a new employer can withdraw from a plan without liability. In effect, Sibley appears to argue that limiting the liability of the new entrants is irrational. All of these claims are unpersuasive.

■ In *Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981), the Supreme Court stated that a party raising an equal protection challenge to social and economic legislation not employing suspect classifications or impinging on fundamental rights bears a "heavy burden." *Id.* at 332, 101 S.Ct. at 2387. Economic legislation must be upheld when the legislative means are rationally related to a legitimate government purpose. *Id.* Such legislation carries with it a presumption of rationality that may only be overcome by a clear showing of arbitrariness and irrationality. *Id.* at 331–32, 101 S.Ct. at 2386–87. *See Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979).

■ The legislative history points out that the MPPAA was "designated to foster plan continuation and growth because [such] provide participants and beneficiaries [with the] greatest security against benefit loss." H.R.Rep. No. 869, 96th Cong., 2d Sess. 51, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 2919. To foster the growth of plans, especially in the face of financial instability associated with employer withdrawals, Congress attempted to encourage new employers to join by providing various incentives, including the "free look" provision and the rule limiting any new employer's liability for unfunded vested benefits to those obligations created after the enactment of the MPPAA. As stated in the House Report:

> In order to avoid creating a severe disincentive to new employers entering a plan, the bill proposes a presumptive rule for allocating withdrawal liability that requires an employer entering a plan after the effective date of withdrawal liability who subsequently withdraws, to fund a

share of the increase in the plan's unfunded benefit obligations during the period of the employer's contributions to the plan.

See H.R.Rep. No. 869, 96th Cong., 2d Sess. 67, *reprinted in* 1980 U.S.Code Cong. & Ad. News at 2935. After considering the purposes for enactment of the challenged provisions, we cannot conclude that Congress' actions were arbitrary or irrational either in affording new employers a free look or in shielding them from liability for unfunded vested benefits that existed prior to a putative employer's agreement to join the plan. Sibley's argument that it is no more responsible for the unfunded vested liability than the new entrants cannot carry the day. The unfunded vested liability referred to relates to the amounts incurred by those employers—including Sibley—who had already received their bargained for benefits (the services of their employees) in exchange for their promises to fund pension benefits. These employers cannot be equated with those that did not receive similar benefits. The question of funding was dealt with on a rational basis and we are unwilling to assess Congress' wisdom in choosing this instead of some other scheme. As the *Turner Elkhorn* court stated in another context:

> It is enough to say that the Act approaches the problem of cost-spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension.

428 U.S. at 19, 96 S.Ct. at 2894. In short, Sibley's equal protection challenge must fail.

E. *Denial of Due Process by Impairment of Contract Rights*

■ Finally, Sibley claims that the retroactive application of the MPPAA impaired its contractual rights with the Union and thereby violated its right to due process of law. Citing *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978), Sibley argues that like the statute there struck down, the MPPAA grossly distorts its contractual obligations to its former employees by imposing obligations substantially beyond the terms of its employment contracts. It asserts that it had fixed its *entire* liability with the Union through the collective bargaining agreement and the May 4, 1980 termination agreement, to which the Fund was not a party. On the contrary, Sibley knew that the collective bargaining agreements it had executed required it to fund its employees' pension benefits, and that it had a contingent responsibility to continue to fund those benefits even in the event it withdrew from the multiemployer fund. As noted previously, the MPPAA was enacted in order to prevent employers from pulling out of multiemployer plans leaving others to shoulder the financial burdens of their withdrawal.

Reliance on *Allied* is not well taken since in that case the Supreme Court struck down as violative of the Contract Clause a Minnesota statute imposing pension fund liability on an employer. A number of critical differences exist between the Minnesota statute and the MPPAA. Most significantly, *Allied* involved a state statute, not an act of Congress. The prohibition against impairing the obligation of contracts is directed against state statutes. U.S. Const. Art. I, § 10 ("No State shall . . . pass any . . . law impairing the Obligation of Contracts . . . ."). In addition, the state legislature was there dealing with an entirely new area of regulation while Congress, in enacting the MPPAA, was not. The withdrawal liability sections of ERISA had been in effect since 1974. The MPPAA modified those existing provisions to effect mandatory—rather than contingent—withdrawal liability. The state statute in *Allied* imposed totally unexpected liability on employers, requiring them to fund vested pension rights for individuals, by shortening the contractual time required for vesting. See *Allied, supra,* 438 U.S. at 247, 250, 98 S.Ct. at 2723, 2725. The MPPAA, on the other hand, requires the withdrawing employer to pay its agreed upon share of the already vested, but not funded, liabilities. Since the MPPAA plainly bears a reasonable rela-

tion to a legitimate governmental purpose, Congress' enactment does not violate Sibley's constitutional right to due process of law.

### V—*Legal Fees*

■ The final matter to decide is whether the Bakery Union was properly made a party to this action. As in the court below, the Union argues that it was made a party to this suit without basis. It asserts there was no case or controversy against it and requests an award of legal fees pursuant to 29 U.S.C. § 1451(e) (Supp. V 1981). Sibley, on the other hand, maintains that the Union was properly made a party to the action because the MPPAA gave it the right to enforce the withdrawal liability obligation. The district court agreed with Sibley and denied the Union's motion to dismiss.

Section 1451(a) provides, in part that:
A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, *or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both.*

*Id.* § 1451(a)(1) (emphasis added). Sibley instituted its action against both the Fund and the Union seeking to enjoin them from enforcing or collecting any of the amounts due for its withdrawal liability. It also sought a judgment declaring that the withdrawal liability provisions of the MPPAA were unconstitutional. Since the statute grants the Union a direct right of action to enforce the withdrawal liability caused by Sibley's withdrawal from the fund, a concrete dispute existed and the Bakery Union was properly made a party to this action. *See Supreme Court of Virginia v. Consumers Union of the United States, Inc.,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); C. Wright, A. Miller & M. Kane, 10A *Federal Practice and Procedure* § 2757, at 585 (1983) (citing cases). There was no reason at the time the district court denied the motion to dismiss to assume that the Bakery Union, either under the cited language of the statute or by virtue of its common law duty to represent its member employees, would not seek to enforce Sibley's withdrawal liability. *See Person v. Association of the Bar of the City of New York,* 554 F.2d 534, 536 (2d Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977). Thus, there existed a sufficient controversy for Judge Telesca to deny the Union's motion to dismiss the action. For these reasons, we reject the Union's claim that it was improperly joined and deny its application for fees.

### VI—*Conclusion*

The judgment of the district court in *Standard* (Appeal Docket No. 83–7004) is affirmed and the judgment of the district court in *Sibley* (Appeal Docket Nos. 83–7328 and 83–7650) is reversed, except to the extent noted in V above.