732 F.2d 312
 Harold SADOWSKY, Vincent Ruisi, Chelsea West Associates,
Plaintiffs-Appellants,
v.
CITY OF NEW YORK, Anthony Gliedman, as Commissioner of the
Dept. of Housing Preservation and Development of
the City of N.Y., Defendants-Appellees.
 No. 1002, Docket 84-7055.
 United States Court of Appeals,
Second Circuit.
 Argued March 8, 1984.
Decided April 19, 1984.
 
 1
 Marvin E. Frankel, New York City (Greg A. Danilow, Andrea M. Likwornik, Kramer, Levin, Nessen, Kamin & Frankel, New York City, of counsel), for plaintiffs-appellants.
 
 
 2
 Margaret G. King, Asst. Corp. Counsel, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, Michael Gage, New York City, of counsel), for defendants-appellees.
 
 
 3
 Before TIMBERS and CARDAMONE, Circuit Judges, and TENNEY, Senior District Judge.*
 
 
 4
 TENNEY, Senior District Judge.
 
 
 5
 Harold Sadowsky and Vincent Ruisi are general partners in the limited partnership, Chelsea West Associates, which owns two vacant and run-down single room occupancy buildings ("SRO's") in New York City. Sadowsky, Ruisi and Chelsea West Associates take this expedited appeal from an order denying their application for a preliminary injunction. They sought to enjoin enforcement as against them of one aspect of a local ordinance, New York City Local Law 19, Act of May 31, 1983, no. 19, 1983 N.Y. City Local Laws ("Law"). The Law governs the renovation and demolition of SRO's, and requires certification that no harassment of tenants has occurred on the premises during a three-year inquiry period preceding application for plan approval or permits for renovation or demolition. However, a waiver of the certification requirement may be granted for those SRO's purchased under contracts entered into and recorded prior to the date on which the bill was approved by legislative committee.
 
 
 6
 Appellants allegedly entered into a contract to purchase the SRO's at issue prior to the cutoff date but did not record the contract. They now contend that the recordation requirement results in a violation of their fifth and fourteenth amendment rights. Since we agree with the court below, 578 F.Supp. 1579, that appellants have failed to make a showing which would entitle them to a preliminary injunction, we affirm.
 
 Background
 
 7
 On March 18, 1983, appellants allegedly entered into a written contract to purchase two vacant SRO's at 332-334 West 19th Street in Manhattan. On May 5, 1983, a committee of the New York City Council ("Council") held hearings on and recommended passage of the proposed Law. The court below noted that the committee's action on the bill on May 5th received significant news coverage. On May 12th the bill was adopted by the full Council, and on May 31st it was signed by the Mayor.
 
 
 8
 The Law's declaration of findings and intent states that the occupants of SRO's "are generally poor and elderly, and often suffer from physical and mental infirmities and social problems which make them particularly vulnerable to ... harassment," Law, supra, Sec. 1, and states further that "it is the policy of the city to encourage the preservation of these dwellings as housing resources for such occupants and to protect these occupants against such harassment." Id. The general thrust of the new Law is to set up a scheme under which the presence of tenant harassment will be investigated before plan approval or permits will issue for the renovation or demolition of any SRO, and under which harassment will be penalized where it is found to have occurred. To this end, the Law requires that owners obtain a "certification of no harassment," 4 N.Y. CITY CHARTER & ADMIN.CODE ANN., ch. 26, tit. D, subtit. IV, art. 40, Sec. D26-40.06 (Williams Supp. 1983-1984) ("Sec. D26-40.06"), before converting such properties "to more profitable uses." Law, supra, Sec. 1. The City's Department of Housing Preservation and Development ("DHPD") will not provide such certification unless it is determined that there has been no harassment of the occupants during the three-year period preceding the application for certification. See Sec. D26-40.06(c), (d)(3). If it is found that harassment has occurred during this inquiry period, certification will be denied and the application for plan approval or for an alteration or demolition permit will be rejected. Furthermore, for a period of three years following the date of denial of certification, no further application for plan approval or for an alteration or demolition permit will be considered by the City. See 3-A N.Y. CITY CHARTER & ADMIN.CODE ANN., ch. 26, tit. C, pt. II, art. 1, sub-art. 118.0, Sec. C26-118.8(b)(5), (7) (Williams Supp. 1983-1984).
 
 
 9
 Under certain circumstances, however, a waiver of the certification requirement will be granted despite a determination that harassment has occurred during the inquiry period. The waiver is available where the Commissioner of the DHPD finds that "the owner of record of the multiple dwelling with respect to which such certification is sought was the owner of record of such multiple dwelling prior to May fifth nineteen hundred eighty-three or had entered into a contract of sale for the purchase of such multiple dwelling which was recorded prior to [May 5, 1983]...." Sec. D26-40.06(e)(1)(a) (emphasis supplied). In order to grant a waiver on these grounds, the Commissioner must also find that the purchaser or owner of record was not the owner of record when the harassment took place and did not participate in or encourage the harassment on the premises, and that the purchase was bona fide and not intended to effect an evasion of the statute. See Sec. D26-40.06(e)(1)(b). On an alternative ground altogether, a waiver may be provided where the owner acquired the multiple dwelling by sale pursuant to foreclosure by mortgage or pursuant to a deed in lieu of such foreclosure. See Sec. D26-40.06(e)(2).
 
 
 10
 On June 24, 1983, over three weeks after the Law was signed, appellants allegedly closed on the two SRO's on West 19th Street. Subsequently, appellants submitted their applications for certification of no harassment and requested a waiver of the certification requirement for each building on the ground that they had contracted to purchase the properties before the May 5th cutoff date. The DHPD, however, rejected the waiver applications on the ground that the contract had not been timely recorded. The agency also informed appellants that there was reasonable cause to believe that harassment had occurred on the premises during the inquiry period, and that a hearing would be held on the matter. The latter hearing was held on February 16, 1984, and a decision was issued on April 5, 1984. The hearing officer concluded that harassment had occurred during the relevant period, and that certification should not be granted to appellants. According to the statutory scheme, the penalties for harassment will now come into play and, since appellants have already been denied a waiver, the three-year moratorium on development will be imposed.[1]
 
 
 11
 Appellants brought suit in the district court seeking, inter alia, preliminary injunctive relief from enforcement of the statute on the ground that, as applied to them, it effected a taking without just compensation in violation of the fifth and fourteenth amendments. The lower court found that the Law was a valid exercise of the City's police powers, and that the buildings on the property would have a remaining economically viable use as SRO's if the three-year moratorium on development were imposed. Applying the general standards regarding takings as set out in Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), and Andrus v. Allard, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the court found that appellants had not raised a substantial question going to the merits, and that they had failed to make the showing required for preliminary injunctive relief. We agree.
 
 Discussion
 
 12
 On a motion for a preliminary injunction, a showing must be made of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). Appellants argue that the court below erred in determining that they had failed to make an adequate showing regarding the merits of the underlying action, and that they have shown irreparable harm, an issue which the district court did not reach. Like the court below, we find it unnecessary to reach the issue of irreparable harm since appellants have shown neither a likelihood of success on the merits nor the presence of serious questions going to the merits.
 
 
 13
 Initially, however, we must address the fact that for the first time on appeal appellants raise a full-blown due process claim based on the four-factor test set out in Nachman Corp. v. Pension Benefit Guar. Corp., 592 F.2d 947, 960 (7th Cir.1979), aff'd on other grounds, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), and recently applied by this court in Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843 (2d Cir.1984) ("Textile Workers ").[2] Since the district court has not had an opportunity to consider this argument, and since the merits of appellants' claims will again be considered by the district court at the trial of the main action, we decline to consider it now. See Radix Org., Inc. v. Mack Trucks, Inc., 602 F.2d 45, 48 (2d Cir.1979); Adato v. Kagan, 599 F.2d 1111, 1116 (2d Cir.1979); Women in City Gov't United v. City of New York, 563 F.2d 537, 542 (2d Cir.1977). Appellants further argue, however, that the recordation provision of the waiver clause is arbitrary and irrational, and thus violates the Due Process Clause of the fourteenth amendment. This argument, unlike the argument based on the Nachman factors, was adequately presented to the court below, and may be considered on this appeal.
 
 
 14
 Appellants' claim that the recordation requirement is arbitrary and irrational is, however, easily disposed of. This requirement, as the district court found, is reasonably designed to avoid collusive back-dating of contracts by purchasers and sellers. The fact that the requirement may work a harsh result in a particular case is not grounds for finding that it should be denied enforcement as arbitrary and capricious. See Wickard v. Filburn, 317 U.S. 111, 129-30, 63 S.Ct. 82, 91-92, 87 L.Ed. 122 (1942). Thus, appellants' contention that the recordation requirement violates the Due Process Clause is without merit.
 
 
 15
 As for the fifth amendment claim, appellants argue that the Law effects a taking without just compensation and that the recordation provision must be enjoined from application as against them in order to bring the Law as applied into compliance with the amendment. Appellants contend first that the district court erred in ruling that the Law as applied to them substantially advanced a valid legislative purpose, and, second, that it erred in ruling that the Law did not destroy the economically viable uses of their property for the purpose of the Takings Clause.
 
 
 16
 As a starting point we note that the fifth amendment is deemed to allow state and local governments broad power to regulate housing conditions without paying compensation for all resulting economic injuries. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982), and the cases cited therein. Further, a taking is less likely to be found when the challenged interference with a property interest "arises from some public program adjusting the benefits and burdens of economic life to promote the common good," Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) ("Penn Central "), than when the interference entails a physical invasion of the property by the government. See id. But these principles, however basic, do not take us far in our analysis. The evaluation of whether a taking has occurred is essentially a factual inquiry, see id., which nevertheless calls "as much for the exercise of judgment as for the application of logic." Andrus v. Allard, 444 U.S. at 65, 100 S.Ct. at 327. There is therefore no precise rule as to when there has been a taking, and the inquiry involves a weighing of public and private interests. See Agins v. City of Tiburon, 447 U.S. at 260-61, 100 S.Ct. at 2141-2142.
 
 
 17
 There is, however, a "multifactor inquiry generally applicable to nonpossessory governmental activity." Loretto, 458 U.S. at 440, 102 S.Ct. at 3179 (citing Penn Central, supra ). The factors accorded particular significance in this inquiry are: (1) "[t]he economic impact of the regulation on the claimant and, particularly, (2) the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659.
 
 
 18
 As to the first factor, regarding economic impact, it is clear that prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred. See Andrus, 444 U.S. at 66, 100 S.Ct. at 327; Penn Central, 438 U.S. at 125, 98 S.Ct. at 2659. Further, " 'taking' challenges have ... been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." Id. (citing Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928)). In this case, appellants presented evidence to show severe economic hardship, based on the anticipated financial drain caused by having to support the buildings for three years without altering their prior use. The court below concluded, however, that appellants had not established that all economically viable uses of the property would be precluded by the three-year moratorium since, "[i]f plaintiffs cannot financially undertake the project, another developer might be able to do so."[3] Opinion filed Jan. 12, 1984, 83 Civ. 8389, slip op. at 6 (RLC) ("slip op."). In the lower court's view, neither the fact that appellants might have to sell their property because of financial hardship under the statute, nor the fact that appellants might be unable to recoup their costs required a finding that a taking had occurred.
 
 
 19
 The district court did not err in making this determination. In Pompa Const. Corp. v. City of Saratoga Springs, 706 F.2d 418 (2d Cir.1983) ("Pompa "), we affirmed the district court's determination that a local zoning law did not effect a taking of appellants' land despite the fact that the law permanently prohibited the commercial use for which appellants had purchased the property.[4] There, the district court found that several beneficial and economically viable uses of the property remained feasible under the challenged ordinance. We said that "the key question," id. at 424, was not whether a particular remaining use would be profitable for appellants, but rather whether appellants could sell the property to someone for that use. Id.
 
 
 20
 Under the second factor in Penn Central --interference with "distinct investment-backed expectations," 438 U.S. at 124, 98 S.Ct. at 2659--appellants' argument is also weak. Since appellants purchased the properties weeks after the Law was signed, and over three months after it first received publicity in the news media, they had no basis at the time of closing for an expectation that there would be no obstacles to the development of their real estate. To be sure, appellants allege that by the closing date they had already made a sizable monetary investment in the property. But they might nevertheless have cut future losses by refusing to close, just as they might have sought to recoup losses incurred prior to closing through court action, if necessary. Thus, on the record before the district court, the equities relevant to appellants' investment expectations do not appear to favor appellants' request for preliminary relief. Furthermore, to the extent that appellants did have expectations, however ill-advised, of immediate and unimpeded development of the property, it must be recognized that, while the zoning law at issue in Pompa imposed a permanent prohibition against a certain use, the Law here imposes a prohibition which is temporary; after three years' time it will no longer restrict the property.
 
 
 21
 The third factor, regarding the character of the governmental action, weighs in favor of appellees' position. The parties appear to agree that the Law as a whole has a valid, even admirable, purpose. As for the contested recordation requirement, we agree with the district court that it does advance a reasonable legislative purpose and that it is valid as a "reliable way of ensuring that the applicant had, in fact, obtained his interest in the premises before the public was placed on notice of [the Law's] regulatory requirements." 578 F.Supp. at 1580. Further, the Law applies to all purchasers in plaintiffs' position. Appellants will therefore "share with other owners the benefits and burdens of the city's exercise of its police power." Agins, 447 U.S. at 262, 100 S.Ct. at 2142. In light of the equities in this case, discussed supra, it would appear that, to the extent that appellants bear a significant burden as a result of this legislation, "that is [within limits] a burden borne to secure 'the advantage of living and doing business in a civilized community.' " Andrus, 444 U.S. at 67, 100 S.Ct. at 328 (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 422, 43 S.Ct. 158, 162, 67 L.Ed. 322 (1922) (Brandeis, J., dissenting)). Thus, appellants have not succeeded in making the requisite showing on the merits of their argument that the Law's recordation provision has caused a taking in this case.
 
 
 22
 Finally, while we agree with the district court that the application of the recordation requirement in this case has troublesome consequences in that "the buildings might remain vacant and prove an eyesore to the surrounding community and that plaintiffs might be penalized for harassment they did not perpetrate," 578 F.Supp. at 1581, we find that as a general matter the equities do not favor appellants. Under the legislative scheme implicit in the Law, statutory certainty serves as a deterrent to harassment. That is, in SRO's where harassment is found, the City will refuse to authorize renovation or demolition for three years. Further, since the certification requirement runs with the land, this certainty inhibits the prospects of selling these buildings for redevelopment purposes. Out of step with this quite obvious scheme, appellants proceeded to close on the purchase of two vacant SRO's despite the fact that appellants did not meet the new Law's requirements for a waiver of certification. Appellants now seek extraordinary equitable relief from the court. They ask the court to prevent a harm which they themselves might have prevented, had they chosen to act consistently with the legislative scheme. Indeed, had they refused to close on the purchase, the prior owners would have been left with the property and with the problem--now in appellants' hands--of how to sell or otherwise realize income on that property under the newly enacted Law.
 
 
 23
 Affirmed.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The contention that appellants' claim is premature because there has been no finding of harassment is, of course, made inapposite by the issuance of the administrative decision. Thus, we have no cause to address the ripeness question
 
 
 [2]
 In Textile Workers, we summarized the Nachman factors as follows:
 (1) the reliance interests of the parties affected; (2) whether the impairment of the private interest is effected in an area previously subjected to regulatory control; (3) the equities of imposing the legislative burdens; and (4) the inclusion of statutory provisions designed to limit and moderate the impact of the burdens.
 Textile Workers, 725 F.2d at 850 (citing Nachman, 592 F.2d at 960).
 
 
 [3]
 Appellants argue that there was no evidence in the record regarding the marketability of the properties in question, and that the district court was therefore in error in reasoning that the properties might be sold. Since, however, appellants had the burden to show that economically viable uses were not available, the court did not abuse its discretion in determining that, where appellants did not show unmarketability, sale of the properties was a possible use
 
 
 [4]
 Although in Pompa the application of a local ordinance was challenged under the fourteenth rather than the fifth amendment, we applied the fifth amendment taking analysis set out in Agins:
 The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests, see Nectow v. Cambridge, 277 U.S. 183, 188 [48 S.Ct. 447, 448, 72 L.Ed. 842] (1928), or denies an owner economically viable use of his land, see Penn Central Transp. Co. v. New York City, 438 U.S. 104, 138, n. 36 [98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631] (1978).
 447 U.S. at 260, 100 S.Ct. at 2141 (quoted in Pompa, 706 F.2d at 421).