724 F.Supp. 1142 (1989)
ABN 51ST STREET PARTNERS, Plaintiff,
v.
The CITY OF NEW YORK, Charles M. Smith, Jr., Commissioner of Buildings of the City of New York, George C. Sakona, Manhattan Borough Superintendent of the Department of Buildings of The City of New York, Paul Crotty, Commissioner of the Department of Housing Preservation and Development of the City of New York, Mel Sokal, Director of the Clinton Neighborhood *1143 Preservation Office of the Department of Housing Preservation and Development of The City of New York, Defendants,
and
The Clinton Planning Council, Inc., the Clinton Coalition of Concern, Inc., Elizabeth F. Hopper, Blanca Revilla, Douglas G. Hatcher, and Vincent DeAgresta, Defendants-Intervenors.
No. 87 Civ. 6135 (RPP).
United States District Court, S.D. New York.
November 15, 1989.
*1144 Graubard Mollen Dannett & Horowitz, Gary Mayerson, Marianne Bretton-Granatoor, New York City, for plaintiff.
Peter L. Zimroth, Corp. Counsel of the City of New York, Albert Fredericks, Asst. Corp. Counsel, New York City, for defendant.
New York Lawyers for the Public Interest, Inc., Marla G. Simpson, Herbert Semmel, New York City, for defendants-intervenors.
Susan J. Sokal, David Weinraub, New York City, Housing Conservation Coordinators, Inc.
Senior Citizen Law Office, Oscar S. Strauss, III, New York City, BLS Legal Services Corp.

OPINION AND ORDER
ROBERT P. PATTERSON, Jr., District Judge:
This is a facial challenge to the validity of Article IX, Chapter 6, Sections 96-109 and 96-110 (the Ordinance) of the New York City Zoning Resolution. The plaintiff, ABN 51st Street Partners, owns property subject to the Ordinance. Plaintiff challenges the Ordinance on federal constitutional and state law grounds. The defendants are New York City and various housing administrators in their official capacities (the City). Defendant-intervenors consist of plaintiff's tenants and community groups from the neighborhood affected by the Ordinance.

Background
Article IX, Chapter 6, Section 96-00 of the New York City Zoning Resolution states:
The `Special Clinton District' established in this resolution is designed to promote and protect public health, safety, general welfare and amenity. Because of the unique geographical situation of the Clinton community situated between the Convention Center and its related activities and the waterfront on the west and by a growing central business district on the east it becomes necessary to propose specific programs and regulations which will assure realization of community and City-wide goals.
Pursuant to that preamble, Section 96-109 provides:

*1145 Prior to the issuance of an alteration permit by the Department of Buildings for an alteration other than an incidental alteration for a building containing residential uses within the Preservation Area [the Clinton District], the Administrator of Housing and Development shall certify to the Department of Buildings:
(a) That prior to evicting or otherwise terminating the occupancy of any tenant preparatory to alteration, the owner shall have notified the Administrator of Housing and Development of his intention to alter the building;

(b) That the eviction and relocation practices followed by the owner of the building satisfy all applicable legal requirements and that no harassment has occurred.[1]
Pursuant to Section 96-109, alteration permits are denied by the Department of Housing, Preservation and Development (HPD) for buildings where harassment has occurred regardless of whether the landlord who committed the harassment still owns the building.[2] The purpose of Section 96-109 is to prevent the displacement of lower income tenants from the Clinton neighborhood.[3] Such displacement was found by the City Planning Commission to result from harassment engaged in to create vacancies so that major renovations may be accomplished. HPD denies alteration permits to preclude major renovations, but not "incidental" renovations. The procedural safeguards of a hearing before HPD and access to an appeal by Article 78 proceedings in state court accompany a finding of harassment and denial of an alteration permit by HPD.
In 1986, HPD denied plaintiff's application for a permit to renovate the building located at 354 West 51st Street, New York, New York. HPD denied the permit, pursuant to Section 96-109, based upon a finding that harassment occurred in 1981 while the building was under prior ownership. The validity of the 1981 harassment finding has never been challenged.
In August 1987, plaintiff filed a complaint seeking damages and equitable relief based on allegations that the Ordinance, on its face and as applied, violated substantive due process, the "takings" clause, the vagueness doctrine and the New York State enabling statute.
In February 1988, the City amended Section 96-109 by the addition of Section 96-110. The City Planning Commission developed and the Board of Estimate approved the amendment after input from the Departments of Environmental Protection and City Planning, a City Planning Commission Study and the Community Board, and after several public hearings.
The amendment was also a reaction to Baco Development Fifty Fourth Street v. City of New York, No. 86 Civ. 2440 (VLB) (S.D.N.Y., Opinion delivered Feb. 23, 1987). That opinion declared that Section 96-109 violated substantive due process, but refused to grant summary judgment on whether the Section violated the State enabling law, the "takings" clause, and the vagueness doctrine. Due to settlement negotiations and the amendment, the opinion in Baco has not been made final.
Section 96-110 states, in parts relevant to this action:
Harassment and Cure
(a) Notwithstanding any provision to the contrary contained in this Chapter, a permit may be issued by the Department of Buildings pursuant to Sections 96-108, 96-109, 96-22 or 96-23 or a special permit may be granted by the City Planning Commission pursuant to Sections 96-107 or 96-108 with respect to any building on a zoning lot in which harassment or other failure to satisfy applicable legal requirements in eviction and relocation has occurred, *1146 provided that the Department of Housing Preservation and Development has determined and certified that all parties in interest to the zoning lot (as the term `party in interest' is defined in the Section 12-10 definition of zoning lot) have entered into a legal agreement approved by the Department of Housing Preservation and Development which shall run with the land and bind all parties in interest and their successors. Such agreement shall provide that:
(1) Lower income housing in an amount equal to at least 28 percent (the `cure percentage') of the total residential floor area of any building to be altered or demolished in which harassment (as defined in subparagraph (d)) has occurred shall be provided in a new or altered building on the same zoning lot as the building to be altered or demolished.
* * * * * *
(d) For the purposes of this Chapter, `harassment' (including other failure to satisfy applicable legal requirements in eviction and relocation practices) shall mean any conduct, described below, by or on behalf of an owner of a building containing dwelling units or rooming units, which materially advanced development, enlargement, demolition of a building, the conversion or alteration of a building or the extension of a use within a building, in the furtherance of which the permit is sought:
(1) the use or threatened use of force which causes or is intended to cause any person lawfully entitled to occupancy of a dwelling unit or rooming unit in such multiple dwelling to vacate such unit or to surrender or waive any rights in relation to such occupancy;
(2) the interruption or discontinuance of essential services....
(3) the failure to comply with provisions of subdivision (c) of Section 27-2140 of Article Seven of Subchapter Five of the Housing Maintenance Code which causes or is intended to cause such person lawfully entitled to occupancy of such dwelling unit or rooming unit to vacate such unit or to waive any rights in relation to such occupancy; or
(4) any other conduct which prevents or is intended to prevent any person from the lawful occupancy of such dwelling unit or rooming unit....
* * * * * *
For any alleged act of harassment which has taken place within 15 years of the date of filing an application for a building permit or special permit pursuant to Sections 96-107, 96-108, 96-109, 96-22, or 96-23 there shall be a presumption, rebuttable by the applicant, that the harassment materially advanced the development of the zoning lot or the enlargement, extension, conversion or alteration of the existing building in furtherance of which the permit is sought.
Such determination of harassment for the purposes of this Chapter shall be made by the Department of Housing Preservation and Development after a hearing....
Notwithstanding anything set forth above, no act of harassment which occurred prior to September 5, 1973, shall constitute harassment for the purposes of this Chapter.
A significant modification contained in Section 96-110 was the incorporation of a means for a landlord to "cure" his property of a harassment finding so that a permit would be granted. That means is the "cure percentage" or dedication of 28 percent of the floor space of the renovated building to low income housing. In addition, the amendment refined the definition of "harassment" which triggers the Ordinance's "cure percentage" condition and eliminated findings of harassment for acts prior to September 5, 1973.
In June 1988, plaintiff amended its complaint to add a challenge to, and damages relief with respect to, the amended version of the Ordinance. Plaintiff also included new claims that the Ordinance violates the federal bill of attainder clause and the *1147 State Penal Code. Plaintiff then moved both for summary judgment on the facial validity of the Ordinance and for an injunction against enforcement of the Ordinance. On April 19, 1989, defendants cross-moved for summary judgment, seeking a declaration that Sections 96-109 and 96-110 are valid and lawful on their face. The Court in this opinion addresses both the motion and cross-motion for summary judgment.

Discussion

I. Due Process

A. Vagueness
"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). The purposes of the vagueness doctrine are to assure fair warning of regulations and to prevent unrestricted delegations of power which facilitate arbitrary and discriminatory enforcement. Id. at 108-09, 92 S.Ct. at 2298-99.
The Supreme Court requires varying degrees of certainty in statutory terms. Economic regulations which impose civil penalties are subject to "a less strict vagueness test." Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). In addition, if the "enactment reaches a substantial amount of constitutionally protected conduct," then courts must apply a more stringent vagueness test. Id. at 494, 499, 102 S.Ct. at 1193-94. Yet, even the most stringent vagueness test "never expect[s] mathematical certainty from our language." Grayned, 408 U.S. at 110, 92 S.Ct. at 2300.
The Ordinance in this matter is an economic regulation. However, the Court in Village of Hoffman Estates held that even though an "ordinance nominally imposes civil penalties," "its prohibitory and stigmatizing effect may warrant a relatively strict test." 455 U.S. at 499, 102 S.Ct. at 1194. The City Ordinance does have a "quasi-criminal" nature in that it aims, in part, to remedy and deter harassment by property owners. Moreover, a stringent test may be warranted because a constitutional property interest is at stake. See Evans v. The City of Chicago, 689 F.2d 1286, 1297 (7th Cir.1982) ("right to acquire, use, enjoy and dispose" of property); But See RRI Realty Corp. v. Village of Southampton, 870 F.2d 911 (2d Cir.1989) (no inherent property right at stake in application for building permit).
The difference between the various levels of scrutiny for vagueness has never been definitively spelled out, as in equal protection jurisprudence. To test the Ordinance for vagueness, it will be reviewed against the circumstances present in the following cases, relied upon by plaintiff, in which courts identified unconstitutional vagueness after applying a stringent test.
In Papachristou v. City of Jacksonville, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972), the Court scrutinized a criminal statute restricting one's freedom to walk the public streets. Justice Douglas writing for the court, ruled that the law was unconstitutionally vague because "there are no standards governing the exercise of discretion." Id. A simple "affront[] to police authority" could be deemed a violation in that case. Id. at 167, 92 S.Ct. at 846.
Similarly the Seventh Circuit recently held a zoning ordinance to be unconstitutionally vague because:
`"No standard for conduct is specified at all." Such a provision simply has no core. This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the due process clause.'
Entertainment Concepts, Inc. III v. Maciejewski, 631 F.2d 497, 501 (7th Cir.1980) (quoting Smith v. Goguen, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974)). The zoning ordinance in that case required theatres to apply for a "special use permit" before showing any "adult" movie. The law did not contain either a standard for deciding whether to grant the permit or any specifications of whether an "X" rated or "R" rated film constituted an "adult" movie. Id. at 501-02.
*1148 Plaintiff argues that the Ordinance is like the unconstitutional laws in Entertainment Concept, Inc. III and Papachristou due to (1) the description in Section 96-110(a)(1) of the cure percentage as "at least 28 percent" and (2) the alleged implied power of HPD to "impos[e] ... additional unspecified conditions upon an owner seeking to win HPD `approval' of the owner's plans to renovate his building." Pl.Br. at 21.

1. The Cure Percentage
Plaintiff contends that Section 96-110(a)(1)'s description of the cure percentage as "at least 28 percent" means that HPD could require a higher figure than 28 percent without justification. Defendants respond by submitting an affidavit of Sylvia Deutsch, Director of the New York City Department of City Planning and Chairperson of the New York City Planning Commission. In these capacities, Ms. Deutsch has been responsible for "considering, drafting and giving preliminary approval for amendments to the City's Zoning Resolution." Deutsch Aff. at 1-2, ¶ 1.[4] According to Ms. Deutsch:
The `at least' language of § 96-110, rather than giving HPD additional authority, simply serves to recognize that a developer may either choose or be constrained by some external factor to provide somewhat more than the minimum amount of lower income housing. For example, because of the configuration of a particular building, the nature of the proposed alteration, and the required specifications for the lower income housing, a developer might not find it feasible to provide a given number of lower income units within the altered building that corresponds precisely to the 28 percent figure. In such a case, the floor area actually dedicated to lower income housing might, by necessity, exceed the 28 percent figure.
Deutsch Aff. at 12, ¶ 23.
The conflicting interpretations leave the Court in the predicament of having to "`extrapolate its [the Ordinance's] allowable meaning.'" Grayned, 408 U.S. at 110, 92 S.Ct. at 2300 (quoting Garner v. Louisiana, 368 U.S. at 174, 82 S.Ct. at 257 (Frankfurter, J., concurring)). "`Extrapolation,' of course, is a delicate task, for it is not within our power to construe and narrow state laws." Id. Federal courts must rely on an "`authoritative'" source when narrowing the potential meaning of the words of a state law to preserve its constitutionality. United States v. 37 Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1405, 28 L.Ed.2d 822 (1971) (quoting Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965)). A federal court "evaluating a facial challenge to a state law" can, however, look beyond a law's bare words for aid in deciding whether a "limiting construction" is appropriate. Village of Hoffman Estates, 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5 (citing Grayned, 408 U.S. at 110, 92 S.Ct. at 2300).
The Court is also aware of the availability of the option of not reaching the merits of the vagueness challenge and invoking the abstention doctrine pending a state court or enforcement agency construction of the City Ordinance. See Railroad Commission of Texas v. Pullman, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) ("public interest [in] ... the avoidance of needless friction" between federal courts and state policies).[5]
Abstention, however, is the exception and not the rule. City of Houston, Texas v. Hill, 482 U.S. 451, 107 S.Ct. 2502, 2512, 96 L.Ed.2d 398 (1987). In light of the finding that the plain intention of the ordinance is not even "`fairly subject'" to plaintiff's proposed interpretation, the Court chooses to resolve the claim. Id. 107 S.Ct. at 2513 (quoting Harman v. Forssenius, 380 U.S. 528, 534-35, 85 S.Ct. 1177, 1181-82, 14 L.Ed.2d 50 (1965)).
The Court finds defendants' interpretation of "at least 28 percent" to be definitive based upon two authoritative sources: the *1149 Ordinance's documented "legislative history" and other language in the ordinance. A City Planning Commission Report (Report) accompanied both the Commission's adoption of Section 96-110 and the submission of the amendment to the Board of Estimate for final approval. The Report explains the intention of the drafters.
According to the Report, the City Planning Commission conducted an economic study which concluded:
The 28% figure ... equate[s] the cost of lower income housing with the attendant development rights. In light of that analysis, the Commission concludes that the 28% figure will not prove unduly burdensome for an owner wishing to cure past harassment.
Def.Ex. C at 7. "The cure formula," as the Report describes it, was put into the Ordinance not as a minimum, but as a restraint upon HPD to prevent an undue burden on "development rights." Id. The Report indicates no intention to permit HPD to require any percentage at all; rather, the emphasis is on the degree of care behind the choice of the figure of 28 percent.
The statute reflects that meaning when it places the term "the `cure percentage'" in parentheses immediately following the first reference to "28 percent." Section 996-110(a)(1). Defining 28 percent as "the `cure percentage'" (emphasis added) further supports the interpretation that once the plateau of 28 percent is reached, the plan is sufficient under the Ordinance to cure past harassment.
The Court holds that the City Ordinance's requirement that, in the event of major renovations, "at least 28 percent" of the building's floor space be set aside for low income housing provides fair notice to property owners and does not invite HPD to set arbitrary and capricious requirements. The clear intent was for the 28 percent figure to function as a notice to property owners of the minimum requirements for approval and the "at least" gives property owners leeway to set aside additional floor space if that would be more convenient.

2. `Additional Unspecified Conditions'
Plaintiff contends that after a finding of harassment, the City Ordinance permits HPD to make "additional unspecified demands as the quid pro quo for" a renovation permit. Pl.Br. at 21. Section 96-110 states that a precondition to the granting of the necessary special permit is that the property owners
have entered into a legal agreement approved by the Department of Housing Preservation and Development which shall run with the land.... Such agreement shall provide that: ....
What follows is a list setting forth the cure percentage and the necessity of satisfying other sections of the City's zoning regulations. Plaintiff reasons that this language gives HPD a silent grant of absolute, unfettered power to reject a proposed agreement at its "whim and caprice." Pl.Br. at 21.
The plain language of Section 96-110 does not contain an affirmative statement that HPD possesses unfettered discretion in deciding whether or not to approve an agreement. The City Planning Commission Report also contains no reference to the power of HPD to make a demand beyond the extensive list. Other sections of the zoning law incorporated in Sections 96-109 and 96-110 may contain some discretionary provisions, but plaintiff is not challenging those provisions. The Court can find no support for plaintiff's contention that HPD can arbitrarily invoke any requirement at all before approving an agreement. At oral argument, the City took the position that "approved" was used in the Ordinance in its meaning of "certified." Accordingly the Court proceeds on the understanding that HPD's role is merely to certify whether or not the mandatory criteria listed by the Section have been met.
It should be pointed out that the absence of an entitlement to a land use permit due to the local government's possession of "`wide discretion'" does not make the regulatory system facially unconstitutional. RRI Realty Corp. v. Village of Southampton, 870 F.2d 911, 917-18 (2d Cir.1989) (quoting Yale Auto Parts, Inc. v. *1150 Johnson, 758 F.2d 54 (2d Cir.1985)). In fact, most land use laws provide decision-makers with such broad discretion that there is neither a "certainty [n]or [a] very strong likelihood that the application [for a permit] would have been granted." Id. To be void for vagueness, a zoning ordinance must be barren of standards, as in Entertainment Concepts, Inc. III, supra. Plaintiff may challenge HPD's application of the long list of criteria as arbitrary and capricious in a non-facial challenge; however, there is no merit to the contention that the Ordinance on its face invites HPD to decide arbitrarily and capriciously to deny such an agreement.
Defendants' cross-motion for summary judgment on the vagueness claims is granted because the portions of the Ordinance challenged by plaintiff neither grant HPD unlimited discretion nor neglect to afford plaintiff knowledge of the regulation.

B. Substantive Due Process
The due process clause requires that a zoning ordinance address a legitimate government purpose through means that are neither arbitrary nor capricious. Pennell v. City of San Jose, 485 U.S. 1, 108 S.Ct. 849, 857-58, 99 L.Ed.2d 1 (1988); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Plaintiff contends that the City Ordinance fails to advance a legitimate purpose and that its means are irrational.

1. Purpose
During the late 1970's and the 1980's, federal funds allocated to new low and moderate income housing were reduced significantly. The homeless families in the City increased substantially and the importance of preserving the low income housing stock became of extreme importance. See Report of the Committee on Legal Problems of the Homeless, 44 Record of the Association of the Bar of the City of New York 33 (January-February 1989) (analyzing shortage of and necessity for preserving City's low income housing stock).
Based on a reading of the text of the Ordinance, the Court finds that the goals of the law are to prevent tenant harassment and community displacement. The displacement prevention aim encompasses the purposes of (a) stabilizing the character of the neighborhood and (b) protecting the stock of housing available for low income residents.
The Second Circuit in Sadowsky v. City of New York, 732 F.2d 312 (2d Cir.1984) scrutinized a regulation which had the same purpose of addressing the housing problems faced by low income New Yorkers. The law at issue in Sadowsky attempted to deter harassment and displacement of tenants in single room occupancy dwellings (SRO's). The Sadowsky court held that the purpose of the regulation was "valid, even admirable." 732 F.2d at 318. In an oral ruling delivered by Judge Broderick in Baco Development Fifty-fourth Street, Inc. v. City of New York, No. 86 Civ. 2440 (S.D.N.Y. Opinion delivered Feb. 23, 1987), the same description was ascribed to the purpose of the unamended version of Section 96-109.[6]See also Pennell, 108 S.Ct. at 857-58 (purpose of protecting low income tenants during housing shortage is legitimate exercise of state's police power). The Court concludes that the Ordinance serves a legitimate public purpose within the State's police power.

2. Means
Baco's due process scrutiny of Section 96-109, before the Section 96-110 amendment, identified two aspects of the means of pursuing the Ordinance's goals that lacked adequate rationality so as to violate due process: (1) the indefinite term of the ban on major renovations after a harassment finding and (2) the provision that a finding of any kind of harassment in a building should result in the total ban on *1151 issuance of a renovation permit. Judge Broderick observed that although judicial review of zoning rules is deferential, these two provisions were unconstitutional because they lacked a foundation in any "thought or consideration whatsoever." Baco, Tr. at 40.
Defendants have addressed Judge Broderick's concerns by amending Section 96-109 with Section 96-110. The amendments were preceded by the completion of an economic analysis of the Clinton neighborhood by the City Planning Commission. The Commission study agreed with Judge Broderick. According to the study, a total ban on major renovations after a finding of harassment was not necessary to deter harassment and prevent displacement of low income tenants from the community. Section 96-109's goals could be satisfied simply by requiring the property owner to set aside 28 percent of the renovated building for low income tenants. Def.Ex. C at 7.
Subsequently several public hearings transpired and Section 96-110 was enacted. Under the amended Ordinance, a property owner can immediately undertake major renovations after a finding of harassment. No genuine issue of fact exists as to whether the cure percentage is rationally related to the statute's goal. The figure of 28 percent is the result of a delicate balancing, unlike the blanket ban found inadequate in Baco.[7] Chief Justice Rehnquist's description of the land use ordinance upheld in Pennell is equally applicable to the incorporation of the cure percentage:
[T]his scheme ... represents a rational attempt to accommodate the conflicting interests of protecting tenants ... while at the same time ensuring that landlords are guaranteed a fair return on their investment. Cf. Bowles v. Willingham, [321 U.S. 503] at 517, 64 S.Ct. 641, 648, 88 L.Ed. 892 [(1944)].
108 S.Ct. at 858.
Section 96-110 also addresses Baco's second due process concern. Judge Broderick found it "draconian" that any finding of harassment could serve as grounds for setting preconditions on renovation permits. Baco, Tr. at 29. The Baco opinion reasoned that not all acts of tenant harassment are part of a scheme to have the building vacated so that the landlord can engage in major renovations.
Judge Broderick noted that the anti-harassment law upheld in Sadowsky lacked this problem. Under the Sadowsky ordinance, a harassment finding also triggered preconditions for the approval of renovation permits. But the Sadowsky law only affected applications for renovation permits filed within 36 months of a finding of harassment. That time limit was sufficient, under the due process clause, to assure that the ordinance rationally addressed those acts of harassment that were part of an effort to renovate and displace low income tenants.
The City did not respond to Judge Broderick's criticisms of Section 96-109 by incorporating a 36 month time limit.[8] Rather, the amended Ordinance seeks to address the problem mainly by limiting the scope of the term "harassment" to defined acts which:
materially advanced development, enlargement, demolition of a building, the conversion or alteration of a building or the extension of a use within a building, in furtherance of which the [renovation] permit is sought.
Section 96-110(d).[9] The Court finds that the incorporation of a nexus requirement *1152 into the definition of harassment assures that the means are tailored to the Ordinance's specific goals and do not arbitrarily punish all acts of harassment with the cure percentage requirement.
The Court also finds no constitutional infirmity to result from the Ordinance's provision that the cure percentage requirement run with the land, rather than only apply while the property is owned by the landlord who committed the harassment. The harassment finding's effect need not be limited to the owner who committed the acts of harassment for the Ordinance's means to be rational.
Dictum in Sadowsky addressed the reasonableness of a provision in which a harassment finding similarly affected the land and not just one owner's rights:
Under the legislative scheme implicit in the law, statutory certainty serves as a deterrent to harassment. That is, in SRO's where harassment is found, the City will refuse to authorize renovation or demolition for three years. Further, since the certification requirement runs with the land, this certainty inhibits the prospects of selling these buildings for redevelopment purposes.
Sadowsky, 732 F.2d at 319. The applicability of the cure percentage to all future owners prevents landowners from undermining the Ordinance's purpose by swapping properties and using corporate shells. The Court finds the "running with the land" effect of a finding of harassment to be related rationally to the goal of preventing harassment utilized to facilitate major renovations and community displacement. Accordingly, the Court grants defendants' cross motion for summary judgment on the issue of substantive due process because the Ordinance provides thoughtful and rational means to pursue a legitimate government purpose.

II. Takings Claims
Plaintiff claims that the Ordinance constitutes a "taking" of property for which just compensation is due under the Fifth and Fourteenth Amendments of the Constitution.
In Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), Justice Marshall identified two distinct strains in "takings" jurisprudence: (1) "permanent physical occupation" and (2) non-possessory "invasion" by regulation of "use."[10] Permanent occupations "invariably" result in findings of a taking. Id. at 427, 102 S.Ct. at 3171-72. Courts only identify a taking in the second category after conducting a balancing test. Id. at 432, 102 S.Ct. at 3174 (citing Penn Central Transport Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).
Plaintiff contends that the Ordinance imposes both a physical and a non-possessory taking.

A. Physical Taking
A physical taking "must `constitute an actual, permanent invasion of the land, amounting to an appropriation of, and not merely an injury to, the property." Loretto, 458 U.S. at 428, 102 S.Ct. at 3172 (quoting Sanguinetti v. United States, 264 U.S. 146, 149, 44 S.Ct. 264, 265, 68 L.Ed. 608 (1924)). For example in Loretto, the Court held that a taking occurred when the government required a property owner to permit a third party to install a cable on the property. The Supreme Court reasoned that the installation amounted to a physical taking because the third party attained "complete dominion" over the part of the property where it had placed the cable. Id. at 436, 102 S.Ct. at 3176. The issue before the Court in this matter is whether the Ordinance causes plaintiff "to suffer the physical occupation of a portion of his building by a third party." Id. at 440, 102 S.Ct. at 3178.
Plaintiff contends that the choice of either refraining from major renovations or *1153 reserving 28 percent of the floor space for low income tenants amounts to government authorization of a physical occupation by a third party. The Court finds the Ordinance's interference with the owner's property rights to be insufficient to constitute a physical taking. A physical taking "absolutely disposs[es] an owner of his rights to use, and exclude others from, his property." 458 U.S. at 435 n. 12, 102 S.Ct. at 3176 n. 12. The burden of either satisfying the cure percentage or refraining from major renovations does not impose the "absolute" possession necessary for a physical taking. As the Loretto Court explained, a physical taking
is qualitatively more severe than a regulation of the use of property, even a regulation that imposes affirmative duties on the owner, since the owner may have no control over the timing, extent, or nature of the invasion.
Id. at 436, 102 S.Ct. at 3176.
Plaintiff is left with substantial control over his building under the Ordinance. Plaintiff can conduct either major renovations or incidental renovations.[11] In either case, the landlord can still select his tenants. The requirement that plaintiff set aside a portion of the building for low income units, in the event that the major renovation route is chosen, is not the equivalent to giving a third party exclusive control over the property. Chief Justice Rehnquist recently pointed out that the Supreme Court has held repeatedly that legal requirements resulting in lower rents do not constitute per se takings. Pennell, 108 S.Ct. at 857 n. 6 (citing Loretto, 458 U.S. at 440, 102 S.Ct. at 3178; FCC v. Florida Power Corp., 480 U.S. 245, 107 S.Ct. 1107, 1112, 94 L.Ed.2d 282; and Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944)). A permanent physical occupation places a landlord in a situation in which "he not only cannot exclude others, but can make no non-possessory use of the property." 458 U.S. at 436, 102 S.Ct. at 3176.
The Supreme Court's holding in Nollan v. California Coastal Commission, 483 U.S. 825, 107 S.Ct. 3141, 3148, 97 L.Ed.2d 677 (1987), further distinguishes the Ordinance from the definition of a physical taking. In Nollan a land owner challenged a California law requiring the establishment of a public easement as a condition precedent to approval of a permit to rebuild a home. If the owner refused to create an easement, then state law absolutely prohibited rebuilding. Justice Scalia, writing for the majority, ruled that if the condition precedent (the easement) furthered the end advanced as the justification for the rebuilding prohibition, then a physical taking could not be found. Id. 107 S.Ct. at 3148. The Nollan decision concluded that a physical taking could be found because the easement condition "utterly fails to further the end advanced as the justification for" the rebuilding permit requirement. Id.
The issue in this matter, under Nollan, is whether the cure percentage condition furthers the Ordinance's stated objective in requiring a permit for major renovations following a harassment finding. As more fully discussed in the determination of the due process issues, the cure percentage advances in a sophisticated manner the goals of prevention of harassment and community displacement. The cure percentage condition imposed upon the landlord's application for the permit cannot constitute a physical taking under Nollan, because the goal of fighting community displacement has an "essential nexus," id., with both the cure percentage condition and the requirement of a permit for major alterations.
Justice Scalia's opinion in Nollan also contains the following dictum which plaintiff repeated frequently at the oral argument of this motion as a grounds for finding a physical taking:
One of the principal purposes of the Takings Clause is `to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); see also San Diego Gas & Electric Co. v. San Diego, 450 *1154 U.S. 621, 656, 101 S.Ct. 1287, 1306, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting); Penn Central Transportation Co. v. New York City, 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).
Id. 107 S.Ct. at 3147 n. 4. A review of the authorities cited as support for this dictum and finds that the sentiment does not expand the scope of the definition of a physical taking to encompass the Ordinance.
In Armstrong, before the governmental action, plaintiffs
admittedly had compensable property. Immediately afterwards, they had none. This was not because their property vanished into thin air. It was because the Government for its own advantage destroyed the [property's] value.
364 U.S. at 48-49, 80 S.Ct. at 1569. Armstrong merely reaffirms the absolute deprivation of control found necessary for a per se taking in Loretto's survey of "takings" precedent.
Justice Brennan's use in San Diego Gas & Electric of the phrase quoted by Justice Scalia also does not affect the definition of a physical taking. The opinion was addressing the question of "whether a government entity may constitutionally deny payment of just compensation to the property owner and limit his remedy to mere invalidation of the regulation instead." 450 U.S. at 653, 101 S.Ct. at 1305 (Brennan, J., dissenting). Justice Brennan was discussing appropriate remedies for takings violations and not setting forth a grounds for finding a takings violation.
Finally, Penn Central's use of the "private bearing of a public burden" reasoning is similarly inapplicable to setting the scope of a per se taking. The Court in Penn Central invokes the phrase as a preface to its development of the balancing formula for determining whether a "use" regulation is a non-possessory taking. 438 U.S. at 123-24, 98 S.Ct. at 2659. The Penn Central decision actually criticizes the phrase relied upon by plaintiff as vague. Id. Although the quote is a consideration in takings jurisprudence, the Court chooses to ground its analysis in the concrete examples and specific formulas laid out in precedents "for determining when `justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than disproportionately concentrated on a few persons." 438 U.S. at 124, 98 S.Ct. at 2659. Thus, the Court finds the Ordinance to be outside the scope of the Supreme Court's definition of a physical taking.[12]

B. Non-Possessory Taking
Penn Central sets forth a "multifactor inquiry generally applicable to nonpossessory governmental activity." Loretto, 458 U.S. at 440, 102 S.Ct. at 3178. This inquiry determines whether a land use law places a burden on a private owner that should be borne by the public at large. Agins v. Tiburon, 447 U.S. 255, 260-61, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The factors for determining whether a regulatory taking has occurred are: (1) the "economic impact on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" and (2) the character or purpose of the government action. Penn Central, 438 U.S. at 124, 98 S.Ct. at 2659 (quoted in Sadowsky, 732 F.2d at 317).
The legitimacy of the purpose of the Ordinance is discussed fully in the substantive due process analysis, supra. The only issue is whether the economic impact of the *1155 regulation is severe enough to constitute a taking.
In this facial challenge the specific economic situation of the plaintiff is not a consideration. The burden is on the plaintiff to show that the enforcement of the Ordinance eliminates economically viable uses of land in the Clinton neighborhood. 732 F.2d at 318 n. 3. Plaintiff asserts that the Ordinance destroys any opportunity for a reasonable economic return on property because the Ordinance has an effect on an owner's ability to possess, to use and to dispose of property.[13] Such contentions are insufficient to satisfy plaintiff's burden. As Judge Broderick observed in upholding Section 96-109 against a "takings" challenge, "Reduction of value ... [is] not destruction of value." Baco, Tr. at 25.
The caselaw "uniformly reject[s] the proposition that diminution of property value" is grounds for a regulatory taking. Penn Central, 438 U.S. at 131, 98 S.Ct. at 2663; see also Keystone Bituminous Coal Association v. DeBenedictus, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The plaintiff has made no showing that either satisfaction of the cure percentage requirement or restricting repairs and modifications to renovations which are "incidental" would seriously impair the profitability of continuing to own a building in the Clinton district.
The defendants and defendant-intervenors have submitted affidavits explaining in detail how neither the incidental renovation nor the cure percentage option would unduly hamper a landlord's financial interests. HPD, the agency charged with enforcing the Ordinance, interprets incidental alterations to include:
almost any work which changes neither the residential use of a building in the Clinton Preservation Area nor the number of living units within the building.
....
The heating plant of the building could be replaced; new windows, kitchen and bathroom fixtures, and electrical and plumbing systems could be installed. Walls could be replastered and even reconfigured.
Sakona Aff. at 3, ¶¶ 5-6. See Simpson Aff.Ex. 1.
On the issue of whether the option of complying with the cure percentage destroys the financial future of a building, the plaintiff has failed to produce any evidence to contradict the conclusions of the City Planning Commission Report. The Court defers to the finding of the Commission's economic study that the 28 percent cure requirement would not eliminate a property owner's capacity to renovate his building profitably.[14]
The plaintiff has not made sufficient showing to raise a genuine issue of material fact that the Ordinance is either a regulatory or a physical taking. The Court grants the defendants' cross-motion for summary judgment on the "takings" claims.

III. Bills of Attainder
Article I, Section 10 provides, "No State shall ... pass any Bill of Attainder." A bill of attainder is an enactment punishing specified persons. Selective Service System v. Minnesota Public Interest Research Group, 468 U.S. 841, 104 S.Ct. 3348, *1156 82 L.Ed.2d 632 (1984). Every legislatively imposed burden is not unconstitutional punishment. Laws tailored to legitimate and non-punitive ends that apply to generalized groups are beyond the scope of the bill of attainder clause. Plaintiff contends, however, that the Ordinance is a vehicle for the City to punish building owners in the Clinton area.
In Selective Service System, the Court set forth a three factor inquiry for determining whether a statute imposes "forbidden punishment" under the bill of attainder clause: (1) whether the statute falls within the historical meaning of punishment, (2) whether the statute furthers non-punitive goals, and (3) whether legislative history evinces an intent to punish. 468 U.S. at 852, 104 S.Ct. at 3355.

A. Historical Scope of Legislative Punishment
The Selective Service System Court held that the "`mere denial of a noncontractual government benefit'" was beyond the scope of those penalties historically attributed to bills of attainder. Id. at 853, 104 S.Ct. at 3355 (quoting Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960)). Approval of a building permit, like the financial assistance at stake in Selective Service System, is a government benefit to which no inherent entitlement exists. See generally RRI Realty Corp., supra. Moreover, the Ordinance, like the statute upheld in Selective Service System, does not completely deny access to the benefit sought. The owner can obtain a major renovation permit by satisfying the cure percentage.

B. Legislative Goals and Intent
Plaintiff relies upon Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866), for the proposition that the City has singled out Clinton neighborhood landlords unconstitutionally. In Cummings, the Court struck down a requirement that former Confederates take an oath of loyalty to the Union before they preach as clergymen. The basis of the Cummings holding was the lack of a nexus between the ban on preaching and the oath requirement. The provision was enacted "not from any notion that the several acts [of past association with the Confederacy] indicated unfitness for the callings, but because it was thought that the several acts deserved punishment ...." Id. 71 U.S. at 320. By contrast, as discussed more fully above, the cure percentage requirement is directly related to preventing the social ill of displacement of low income tenants in the Clinton community caused by harassment and to stabilizing the character of the neighborhood.
Evidence of the intent of the City to address these nonpunitive, land use concerns is the Commission Report. Although the Ordinance is in part aimed at deterring harassment, the Report reveals that the drafters had a much larger picture in mind. The City sought to address a cycle that was ravaging the stability of a community. Additional evidence that the enactment's intent is to prevent displacement, rather than simply to punish landlords who harass, is that the law reaches landlords who have never harassed and are not even willfully taking advantage of past harassment. See Selective Service, 468 U.S. at 855, 104 S.Ct. at 3356 ("punitive legislation ordinarily does not reach those whose failure to comply with the law is not willful").
The Court finds no genuine issue of fact exists as to whether the Ordinance imposes forbidden punishment under the bill of attainder clause. The defendants' cross-motion for summary judgment is granted.

IV. State Enabling Statute
Municipalities in New York State lack inherent power to enact and enforce land use regulations. The State Enabling Statute, General City Law § 20(24), authorizes the City to establish districts and adopt zoning ordinances for each district:
Subject to the constitution and general laws of this state, every city is empowered:
....
24. To regulate and limit the height, bulk and location of buildings hereafter erected, to regulate and determine the area of yards, courts and other open *1157 spaces, and to regulate the density of population in any given area, and for said purposes to divide the city into districts. Such regulations shall be uniform for each class of buildings throughout any district, but the regulations in one or more districts may differ from those in other districts. Such regulations shall be designed to secure safety from fire, flood and other dangers and to promote the public health and welfare, including, so far as conditions may permit, provision of adequate light, air, convenience of access, and the accommodation of solar energy systems and equipment and access to sunlight necessary therefor, and shall be made with reasonable regard to the character of the buildings erected in each district, the value of land and the use to which it may be put, to the end that such regulations may promote public health, safety and welfare and the most desirable use for which the land of each district may be adapted and may tend to conserve the value of buildings and enhance the value of land throughout the city.
Section 20(24) contains no provision explicitly forbidding the passage of the Ordinance. "Power to adopt provisions not expressly forbidden by the enabling authorization may ... be implied where there exists independent justification for provisions within the spirit of the enabling legislation." FGL & L Property Corp. v. City of Rye, 66 N.Y.2d 111, 115, 495 N.Y.S.2d 321, 485 N.E.2d 986 (1985) (citation omitted). Thus the issue raised by plaintiff is whether the Ordinance is within the spirit of Section 20(24), as defined by New York State courts.
Plaintiff argues that the Ordinance violates the fundamental enabling statute premise that "`zoning ... in the very nature of things has reference to land rather than to owner.'" Id. at 116, 495 N.Y.S.2d 321, 485 N.E.2d 986 (quoting Vernon Park Realty v. City of Mount Vernon, 307 N.Y. 493, 500, 121 N.E.2d 517). In a case relied upon by plaintiff, the New York Court of Appeals explained:
While it is proper for a zoning board to impose appropriate conditions and safeguards in conjunction with ... a grant of a variance or special permit, such conditions and safeguards must be reasonable and relate only to the real estate involved without regard to the person who owns or occupies it.
Dexter v. Town Board of Town of Gates, 36 N.Y.2d 102, 105, 365 N.Y.S.2d 506, 324 N.E.2d 870 (2d Dept.1975) (citation omitted).
All land use laws relate to the owner or occupier to some extent because such laws regulate the acts of those individuals (the users). New York courts have held that zoning rules address an owner rather than land use when the regulation applies only to one owner's plot of land, FGL & L, supra, or "is plainly personal" and "`cannot be used by any other'" owner. Dexter, 36 N.Y.2d at 105, 365 N.Y.S.2d 506, 324 N.E.2d 870 (striking down regulation that states that change of zone "shall inure to benefit of" only named individual). See also Weinrib v. Weisler, 27 N.Y.2d 592, 313 N.Y.S.2d 407, 261 N.E.2d 406 (1970) (owner rather than land is regulated by prohibition against assignment of building permits).
The Ordinance is unlike those regulations which the New York courts held to relate to owners. Even though an owner's act of harassment triggers Sections 96-109 and 96-110, the Ordinance is a reaction not to that conduct, but to that conduct's effect on the character of the community. The Sections apply to buildings in the entire Clinton district. Moreover, the conditions run with the land. The Ordinance focuses on prevention of displacement of low income tenants from the community and stabilizing the character of the neighborhood rather than on a single owner.
The Court also finds authority in Section 20(24) for the enactment of the Ordinance. The provisions permitting regulations to "promote the public health and welfare" and mandating "regard to the ... value of land" are relevant to the Ordinance. The New York Court of Appeals has held that regulations "to correct social and historical patterns of housing deprivation ... is well *1158 within its [a municipality's] delegated `general welfare' power." Maldini v. Ambro, 36 N.Y.2d 481, 485-86, 369 N.Y.S.2d 385, 330 N.E.2d 403 (1975) (upholding creation of Retirement Community District). Compare Allen v. Town of North Hempstead, 103 A.D.2d 144, 478 N.Y.S.2d 919, 921 (2d Dept.1984) (striking down durational residency requirement for elderly as unrelated to housing needs). The Ordinance was aimed at an emerging housing problem in the Clinton area. Moreover, the incorporation of the cure percentage after the Commission's economic research manifests "regard to the ... value of the land." Defendants' cross-motion for summary judgment is granted because no genuine issue of material fact exists as to whether Section 20(24) authorizes the enactment of the Ordinance.

Conclusion
No genuine issue of material fact exists as to whether the Ordinance is valid on its face. Defendants' cross-motion for summary judgment is granted in its entirety and plaintiff's motion for partial summary judgment and related injunctive relief is denied in its entirety.
SO ORDERED.
NOTES
[1] Italics in all quotations from the New York City Zoning Resolution are contained in the original and indicate that Section 12-10 defines the term.
[2] This policy of denials is designed to prevent harassing landlords from swapping buildings or using transfers to shell corporations to avoid the anti-harassment ordinance.
[3] The Clinton District comprises the area of Manhattan bounded by Eighth and Twelfth Avenues and West 44th and West 59th Streets.
[4] Under the City Charter, ordinances of the type in this litigation originate in the New York City Planning Commission.
[5] The Court is not aware of any local challenges currently pending in this matter. In addition, defendants have not requested that the Court resort to abstention.
[6] Settlement efforts and the amendment (Section 96-110) to Section 96-109 followed the oral opinion in Baco, thereby eliminating opportunities to appeal or move for reargument. Both parties to this action concede that the Baco decision never became final and binding. Nevertheless, the Baco opinion provides the Court with guidance.
[7] The Court recognizes that the cure percentage does not necessarily aid those particular tenants harmed by harassment. However, the Ordinance is rationally related to the legitimate goals of deterring harassment and maintaining the character of the neighborhood.
[8] Section 96-110 does contain a time limitation of 15 years.
[9] The Ordinance incorporated this nexus requirement in the definition of the term "harassment" in Section 96-110(d). Section 96-110(d) opens with a paragraph stating: "For the purposes of this Chapter, `harassment' (...) shall mean...." After that phrase is the "materially advanced" nexus requirement. Then a list of four types of harassment follows. The "materially advanced" nexus requirement applies to each of the four distinct types of harassment because of its position after the phrase "`harassment' shall mean" and before the list of the four separate kinds of harassment.
[10] It is possible further to separate non-possessory takings into two categories: temporary invasions and use regulations. Both are subject to the Penn Central balancing test, infra.
[11] See, non-possessory taking analysis, infra, for discussion of incidental repairs option.
[12] Plaintiff also cites the reliance in Seawall Associates v. City of New York, 74 N.Y.2d 92, 544 N.Y.S.2d 542, 542 N.E.2d 1059 (1989), on the "private bearing of a public burden" quote as support for a finding of a physical taking in this case. The Court finds Seawall distinguishable. Seawall held that a physical taking occurred because a local law "forc[ed] plaintiffs to rent their properties to strangers." Id. The foundation for this observation was a law's mandate that a landlord both rehabilitate and let units as SRO's. The New York Court of Appeals reasoned that the combination of an anti-warehousing provision with an extensive use regulation resulted in occupation of the premises by government authorized third parties. The Ordinance in this case lacks an anti-warehousing provision and regulates use only in the event that harassment has occurred and a major renovation permit is sought. This case presents no opportunity for the Court to address the constitutionality of anti-warehousing legislation.
[13] Plaintiff, however, acquired the property with knowledge of the prior finding of harassment and Section 96-109 and presumably paid a reduced price because of the findings effect on future building permits.
[14] Plaintiff also claims that the Ordinance violates New York Penal Law § 155.05(2)(e):

A person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not delivered, the actor or another will:
....
(ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships.
In light of the finding that the Ordinance does not even deprive the owner's property of economic viability, there is no genuine issue of fact that the Ordinance's effect rises to the level of extortion.